CHARLES G. LA BELLA (SBN 183448)
charles.labella@btlaw.com
ERIC BESTE (SBN 226089)
eric.beste@btlaw.com
ZACHARY P. HELLER (CA Admission pending)
zachary.heller@btlaw.com
**BARNES & THORNBURG LLP**
655 West Broadway, Suite 900
San Diego, California 92101
Telephone:  619.321.5000
Facsimile:   619.284.3894

RANDY GORDON
randy.gordon@btlaw.com
**BARNES & THORNBURG LLP**
2121 N. Pearl Street, Suite 700
Dallas, TX 75201
Telephone:  214.258.4148
Facsimile:   214.258.4199

Attorneys for Plaintiff,
Public Watchdogs

## UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PUBLIC WATCHDOGS, a California 501(c)(3) corporation,<br><br>Plaintiff,<br><br>v.<br><br>SOUTHERN CALIFORNIA EDISON COMPANY; SAN DIEGO GAS & ELECTRIC COMPANY; SEMPRA ENERGY; HOLTEC INTERNATIONAL; UNITED STATES NUCLEAR REGULATORY COMMISSION; and DOES 1 through 100,<br><br>Defendants. | Case No.  **'19 CV 1635 JM   MSB**<br><br>**COMPLAINT FOR:**<br><br>(1) **Violation of the Administrative Procedure Act (5 U.S.C §§ 702,** *et seq.***)**<br><br>(2)  **Public Nuisance (Cal. Civ. Code §§ 3479-3480)**<br><br>(3)  **Strict Products Liability**<br><br>**[JURY TRIAL DEMANDED]** |

## COMPLAINT

Plaintiff Public Watchdogs hereby submits its Complaint against Defendants Southern California Edison Company ("Edison"), San Diego Gas & Electric Company ("SDG&E"), Sempra Energy ("Sempra"), Holtec International ("Holtec"), United States Nuclear Regulatory Commission ("NRC"), and Does 1 through 100 (collectively, "Defendants") and alleges as follows:

## PRELIMINARY STATEMENT

1.      This action seeks emergency and other appropriate injunctive relief to prevent an imminent threat to public health and safety as a result of Defendants' conduct at the San Onofre Nuclear Generating Station ("SONGS"). Specifically, Defendants are risking the lives of millions of California residents and the prospect of irreparable harm to the environment by removing spent nuclear fuel from a storage location specifically designed and used for that purpose for decades, transporting it into canisters that are damaged, defective, and not properly designed to serve their intended purpose, and dropping it into holes a mere 108 feet from one of California's most populated public beaches, within a tsunami zone, surrounded by active fault lines.

2.      The resulting harm to California residents is not speculative. Defendants have already committed grievous errors in their management and handling of spent nuclear waste. Defendants have ignored their legal obligations through continuing negligence and a cavalier approach to public safety at SONGS, and have violated regulatory law by failing to properly report "near-miss" events. For its part, the NRC has all but abdicated its regulatory and supervisory responsibilities to the commercial interests at SONGS. As set forth in detail below, Defendants' conduct creates an imminent risk that deadly nuclear waste will be released, resulting in the death, injury, illness, and/or significant bodily harm to millions of California residents, as well as damage to and destruction of wildlife, agriculture, public and private property, and critical transportation infrastructure.

3.      Public Watchdogs seeks to protect the people and resources of Southern California from the imminent threat of nuclear contamination and disaster by staying the so called "remedial action" proposed by the owners and operators of SONGS, rubber- stamped by the federal agency tasked with regulating the handling of nuclear waste, and negligently implemented by the contractor hired to carry out the ill-conceived plan.

**THE PARTIES**

4.      Plaintiff Public Watchdogs is a 501(c)(3) non-profit corporation that advocates for public safety by ensuring that government agencies and special interests comply with all applicable laws, including public-safety and environmental-protection laws, especially in the public-utilities industry.[1] Plaintiff has at least one member who lives within the zone of exposure to a catastrophic release of radioactive material from SONGS.

5.      Defendant Southern California Edison Company ("Edison") is a public utility doing business within the state of California. On information and belief, Edison owns 78.2 % of SONGS. Edison has a long track record of ignoring public safety concerns which has resulted in significant loss of life and property in California.[2]  Edison's actions at SONGS, as set forth in more detail below, continue

---

[1] Most recently, Public Watchdogs was awarded nearly $60,000 dollars for its contributions in a case contesting Southern California Edison's plan to pass $3.3 billion in costs on to the public.  *See* Jeff McDonald, *State Utility Regulators Award $58,000 to Group that Opposed San Onofre Settlement*, San Diego Union Tribune (Aug. 20, 2019), https://www.sandiegouniontribune.com/news/watchdog/story/2019-08-20/state-utility-regulators-award-58-000-to-group-that-opposed-san-onofre-settlement.

[2] *See, e.g.*, Elizabeth Douglass, *Edison Fined $30 Million for Fraud*, L.A. Times (Sep. 19, 2008), https://www.latimes.com/archives/la-xpm-2008-sep-19-fi-edison19-story.html (illustrating Edison's history of covering up safety concerns, including at SONGS: "At the Edison-run [SONGS], the probe found that managers suppressed injury reporting by asking employees to treat themselves and by pressuring doctors to alter records or use Steri-Strips in lieu of stitches."); Press Release, Cal. Pub. Util. Comm., *CPUC Enhances Safety, Issues 51.5 Million in Penalties and Remediation Against SCE and NextG for Malibu Canyon Fire* (Sep. 19, 2013), http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M077/K126/77126214.PDF (containing admissions by Edison that

BARNES & THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

to exhibit a recklessly cavalier approach to protecting the health and safety of the public.

6.    Defendant San Diego Gas & Electric ("SDG&E") is a public utility doing business within California. On information and belief, SDG&E owns approximately 20% of SONGS.

7.    Defendant Sempra Energy, Inc. ("Sempra") is the parent company of SDG&E doing business within the state of California.[3]

8.    Defendants Edison, SDG&E, and Sempra are collectively referred to herein as the "SONGS Defendants."

9.    Defendant Holtec International ("Holtec") is a "diversified energy technology company" headquartered in Florida and doing business within the state of California. Holtec, like Edison, has a checkered past in its private and public dealings, which is discussed below in greater detail.[4]

---

it violated applicable regulations by "with[holding] pertinent information from the governing agency" and "failing to take prompt action to prevent the pole overloading [which caused the Malibu Canyon Fire in 2007]"); Herman K. Trabish, *California Regulators Finalize $16.7 Million Fine to SoCal Edison for Secret San Onofre Deal*, Utility Dive (Dec. 7, 2015), https://www.utilitydive.com/news/california-regulators-finalize-167-million-fine-to-socal-edison-for-secre/410302/ (fining Edison $16.7 million for engaging in unethical conduct and providing misleading information relating to the deal to close SONGS, including eight instances of "undisclosed backchannel communication" between the then-president of the CPUC and a Vice President at Edison); Howard Fine, *SCE Fined $8M for Alleged Safety Violations Uncovered After Fallen Powerline Incident*, L.A. Bus. J. (Oct. 17, 2018), http://labusinessjournal.com/news/2018/oct/17/sce-fined-8m-alleged-safety-violations-uncovered-a/ (fining Edison $8 million for violating safety violations, which ultimately led to the electrocution of three bystanders).

[3] Sempra is currently under investigation for its role in the massive natural gas leak in Aliso Canyon, which sickened thousands of Southern California residents. The underlying causes of this gas leak, according to an in-depth report, are eerily similar to the facts at issue in this case: both involve "safety failures" and "inadequate regulations" that can—and have—led to public health emergencies. *See* Associated Press, *California Regulators Mull Penalties over Huge 2015 Gas Leak*, L.A. Times (June 28, 2019), https://www.latimes.com/local/lanow/la-me-aliso-canyon-leak-possible-penalties-20190627-story.html.

[4] Holtec's history of run-ins with regulatory agencies started nearly two decades ago and continue to be an issue today. In October 2010, Holtec was "debarred" (essentially, suspended) as a contractor by the Tennessee Valley Authority ("TVA")

10.     Defendant United States Nuclear Regulatory Commission ("NRC") is a federal government agency that is mandated by Congress to license and regulate the Nation's civilian use of radioactive materials to protect public health and safety, promote the common defense and security, and protect the environment. The NRC is responsible for the regulation and oversight of the storage of radioactive nuclear material, including the decommissioning of nuclear power plants and the safe disposal and storage of high-level nuclear waste also known as "Spent Nuclear Fuel" (SNF). Because SNF is a toxic, radioactive byproduct from nuclear reactors, and remains harmful for hundreds of centuries, the NRC has an obligation to ensure the safe and effective storage any such waste, and to include the public in the process. For example, when evaluating plans to store SNF at a nuclear power plant, the NRC must authorize only those actions that are consistent with "the protection of the public health and safety, and the environment," and must act consistently with "the views of the population surrounding such reactor."  42 U.S.C. § 10152(1) and (5). Similarly, the NRC must "solicit comments from affected parties" whenever a licensee submits a decommissioning plan, 10 C.F.R. § 20.1405(b), and seek to "obtain information through *direct observation and verification of licensee activities* to determine whether the facility or site is being decommissioned safely, that radioactive material is safely stored onsite prior to removal from the site, and that decommissioning

_____

in connection with improper and undisclosed payments made to a federal official in 2001 to secure a nuclear contract. The federal official pled guilty to making false statements for failing to disclose the $54,000 in payments received from Holtec. A true and redacted copy of the March 2010 TVA Report is attached here as **Exhibit 1**. And Holtec is *currently* under fire in New Jersey, related to claims made in connection with the company's efforts to obtain a $260-million-dollar tax break for a plant in Camden. As part of that process, Holtec's CEO Kris Singh submitted certified forms where he answered "no" to the question of whether Holtec had ever been barred from doing business with a state or federal agency. *See* Nancy Solomon and Jeff Pillets, *A False Answer, A Big Political Connection and $260 Million in Tax Breaks*, ProPublica (May 23, 2019), https://www.wnyc.org/story/false-answer-political-connections-millions-tax-breaks/. In June 2019, New Jersey regulators froze Holtec's $260 million tax-incentive award pending further investigation. *See* June 2019 Task Force Report at 44-45, a true and correct copy of which is attached as **Exhibit 2**.

activities are in conformance with applicable regulatory requirements, licensee and non-licensee commitments, and management control," NRC Inspection Manual, Ch. 2602-02.03 (available at https://www.nrc.gov/reading-rm/doc-collections/insp-manual/manual-chapter/mc2602.pdf) (emphasis added). These statutes and regulations, among others,[5] make clear that the NRC must independently evaluate the decommissioning of nuclear power plants and storage of SNF, and after considering public input, approve only those plans that ensure the protection of public health and safety and the environment.

11.     Unfortunately, the NRC has a history of abdicating its regulatory and supervisory responsibilities over the nuclear industry. The NRC's abdication of its regulatory duty has been chronicled by the Project on Government Oversight ("POGO") since at least the 1990's. POGO is a nonpartisan non-profit organization that investigates and works to expose waste, fraud, abuse, and conflicts of interest in government.[6] An early report from POGO details some of the regulatory failings of the NRC, uncovered during a two-year investigation into the agency. *See* Scott Amey, *Who the Hell is Regulating Who? The NRC's Abdication of Responsibility*, Proj. Pub. Good (Sept. 1, 1999), a true and correct copy of which is attached here as **Exhibit 3.** A non-exhaustive list of these failings includes the following:

    a.     The NRC failed to independently verify that nearly 400 "high priority safety improvements" were ***actually*** implemented at the nuclear power plants where they were required;

___

[5] *See, e.g.,* 42 U.S.C. § 2239 (obligating NRC to hold hearings whenever an interested person shows that an licensee's violation of conditions "would be contrary to providing reasonable assurance of adequate protection of the public health and safety."); 10 C.F.R. § 2.105 (obligating the NRC to provide public notice of proposed actions with respect to any applications for, among other things, an amendment to an operating license, or a license "to acquire, receive or possess spent fuel for the purpose of storage in an independent spent fuel storage installation (ISFSI)").

[6] *See, e.g. About*, POGO, https://www.pogo.org/about/ (last visited August 20, 2019).

b.     The agency claimed that it had resolved safety issues relating to degraded steam tubes in 1988. Despite the NRC's "resolution" of this issue, degraded steam tubes ruptured at *six* nuclear plants over the next 10 years; *and*

c.     From 1984 to 1999, the NRC identified 62 "high priority safety issues," *more than half* of which were deemed "resolved" by the NRC even though *no safety improvement was made*. In other words, rather than fixing safety issues classified as "high priority," the NRC trusted that the nuclear industry had taken care of the problems.

12.     Following POGO's reporting on the systemic failures and regulatory capture at the NRC, the agency has received numerous inquiries from congressional representatives concerning the NRC's *laissez faire* approach to nuclear safety. In virtually each instance, the NRC supplied a non-answer, essentially telling the legislators that "we are the NRC and we know what we are doing."

13.     The true names and capacities of Defendants identified as DOES 1 through 100 are unknown to Plaintiff, who will seek the Court's permission to amend this pleading in order to allege the true names and capacities as soon as they are ascertained. Plaintiff is informed and believes, and on that basis alleges, that each of the fictitiously named Defendants has some degree of liability to Plaintiff or has some other cognizable interest in this lawsuit or may be real parties in interest.

## JURISDICTION AND VENUE

14.     This court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1346(a)(2), 1367, 2201-02, and 5 U.S.C. § 702.

15.     Defendants have waived sovereign immunity pursuant to 43 U.S.C. § 666 and provisions of the Administrative Procedures Act, 5 U.S.C. §§ 701 to 706.

16.     Venue in the United States District Court in and for the Southern District of California (the "District Court") is predicated on 5 U.S.C. § 703 and 28 U.S.C.

Barnes &
Thornburg LLP
Attorneys At Law
San Diego

- 7 -

§ 1391(e), in that this is a civil action brought against an agency of the United States acting in its official capacity under color of legal authority. A substantial part of the events or omissions giving rise to the claim for relief stated in this Complaint occurred in this judicial district, and the effect of the government actions complained of occurs in the Southern District of California.

17.     Plaintiff is a non-profit organization with at least one member located in San Diego County, California. The District Court has a substantial interest in protecting the rights of Plaintiffs and its members by fashioning the remedies requested in this Complaint.

## **GENERAL ALLEGATIONS**

### I.     **SONGS BACKGROUND**

18.     In August 1963, Congress enacted Public Law 88-82 authorizing the "construct[ion], operate[ion], maintain[enance], and use" of a nuclear power plant on approximately 90 acres of land located at the Camp Pendleton military base. In May 1964, the United States granted the SONGS Defendants an easement for the sole purpose of "construction, operation, maintenance and use of a nuclear electric generating station" at the Camp Pendleton site. A true and correct copy of the 1964 Easement is attached as **Exhibit 4**.

19.     The SONGS Defendants operated three nuclear electric generating units at SONGS. On information and belief, SONG's first unit operated from 1968 until 1992, when it began the decommissioning process. SONG's second and third units operated from 1983 or 1984 (respectively) until June 12, 2013, when both units ceased operation and began the decommission process (due, in part, to the safety and regulatory failures discussed in Section I.A, *infra*).

A.   **The alarming history of safety and regulatory failures during SONGS operation.**

20.   Throughout the years, SONGS has had numerous instances of poor safety and regulatory compliance. Below is a representative list of notable examples.

21.   In 1977, the SONGS Defendants admitted to a "blunder" at their second operating unit ("SONGS Unit 2")—when they installed a 420 ton nuclear reactor vessel backwards. The mistake was discovered by the SONGS Defendants approximately eight months later while preparing to install a second reactor at the site. Rather than investigating how this could happen and immediately implementing corrective actions to ensure that the nuclear reactor vessel was installed according to its specifications, the SONGS Defendants instead chose to call the mistake "*inconsequential*" and a result of a "communications problem." Their crude technical solution was to "load the fuel from the other end" and proceed with the construction. At the time, the NRC determined that the backwards installment was "not much more than an embarrassment."[7]

22.   In November 2004, the SONGS Defendants decided to replace the original Westinghouse steam generators at SONGS Units 2 and 3. Rather than replace them with the proven and time-tested Westinghouse units, which worked without incident since the early 1980s, the SONGS Defendants chose to use replacement steam generators ( "RSGs") made by Mitsubishi Heavy Industries. On information and belief, these RSGs were based on an experimental design and were the largest steam generators ever used in the nation.

23.   On information and belief, the SONGS Defendants and Mitsubishi decided to remove essential safety equipment from the RSGs so they could fit additional steam tubes (which would increase the amount of electricity generated by the RSGs). This design change caught the attention of Dwight Nunn, then a Vice

---

[7] *See Reactor Blunder 'Inconsequential,' Company Says*, Asbury Park Press, (Dec. 4, 1977), newspapers.com/clip/7525635/sanonofreebackwards1977.

President at Edison, who wrote a letter warning of the dire consequences if the RSGs for SONGS were altered pursuant to Mitsubishi's proposed design. A true and correct copy of Nunn's Letter dated November 30, 2004, is attached as **Exhibit 5**. In the letter to Mitsubishi, Mr. Nunn wrote: "I am concerned that there is the potential that design flaws could be inadvertently introduced into the [RSG] design that will lead to unacceptable consequences." *Id.* at 3. He noted that these concerns were greatly amplified because "San Onofre is located in a high seismic zone." *Id.* at 2.

24.   On information and belief, the unlicensed RSGs were neither independently reviewed nor submitted for design review and approval by the NRC before the SONGS Defendants proceeded with installation. NRC regulations require nuclear power plant operators (and their contractors) to submit modifications to technical specifications, such as a change in the design of a steam generator, for regulatory approval *before* using the new equipment to operate the plant. *See, e.g.*, 10 C.F. R. § 50.59 (setting forth the NRC's requirement that nuclear power plant operators submit proposed technical changes for agency review and approval prior to implementation). This pre-approval requirement is mandatory except in the limited circumstances where the proposed replacement is substantially equivalent to the predecessor equipment, which is often referred to as a "like-for-like" replacement. However, the new RSG design was significantly different than the one used to manufacture the Westinghouse generators: the new RSG design generated more electricity by using more steam tubes than the Westinghouse generators, which was possible because of a reduction in the number of anti-vibration components.

25.   On information and belief, the SONGS Defendants bypassed the NRC's pre-implementation review process by falsely claiming that the RSGs were designed to be "like-for-like replacements." This is plainly contradicted by Mr. Nunn's letter where he notes that Edison knew that, "although the old and new steam generators will be similar in many respects[,] they *aren't like-for-like replacements*." Exhibit 5 at 2 (emphasis added); *see also* Trabish, *supra* note 2. Edison's admissions were

corroborated by Mitsubishi after it conducted an investigation into the design of the RSGs and concluded that Mitsubishi and Edison "were aware of serious problems, but rejected safety modifications to avoid a rigorous safety review process."Trabish, *supra* note 2; *see also* Mitsubishi's Root Cause Analysis Report at 51, a true and redacted copy of which is attached as **Exhibit 6**. Once again, industry expedience was chosen over public safety.

26.     Despite Nunn's warnings, between 2009 and 2010, the SONGS Defendants proceeded with installing the RSGs surreptitiously, void of the transparency or public participation required by the NRC's rules and regulations. Nor was any objective risk assessment conducted by an independent third party to identify and enumerate the risks to public safety posed by the installation of these experimental RSGs at SONGS, or how these RSGs could impact operations at the nuclear power plant.

27.     On January 31, 2012, the years earlier manifested themselves and the RSGs malfunctioned, just as Nunn had predicted. The RSG in SONGS Unit 3 was operating at full power when an unrestrained vibrating steam tube broke, causing a leak of deadly radioactive steam. This dangerous outcome was caused by the precise design flaw (commonly referred to as a "water hammer") that Nunn identified eight years earlier.

28.     In addition to the major safety issues and recklessly negligent events discussed above, SONGS also received countless other citations during the course of its operation, including for public safety and security issues caused by careless operation and maintenance of the power plant. These included citations for failed emergency generators, improperly wired batteries, inability to improve issues regarding long-standing "human performance" at SONGS, failure to develop

procedures for cyber security of electronic devices, and submission of falsified fire safety data.[8]

29.     Following the January 2012 nuclear event, the SONGS Defendants were the targets of growing public outrage and political scrutiny. Finally, on June 7, 2013, the SONGS Defendants announced the permanent shutdown of SONGS.

30.     The SONGS Defendants' mismanagement of the decommissioning process—and the NRC's failure to enforce federal regulations passed specifically to protect public safety, as detailed in Section II, *infra*—have caused SONGS to become exactly what the community was afraid of: a continuing liability and an ever-present existential threat.

## II.   NRC ABDICATES MEANINGFUL SUPERVISION AT SONGS:  A CHRONOLOGY OF SIGNIFICANT REGULATORY FAILURES

31.     The NRC has a long, well-documented history of deference to the nuclear power industry, consistently relying on operators of nuclear power plants to identify safety hazards and implement corrective action without the agency's oversight (and without verifying that corrective actions have actually been implemented or are effective). *See supra* Paragraphs 11-12. The NRC routinely grants requests for exemptions from the rules and regulations promulgated to ensure that nuclear facilities are operated and decommissioned safely. And when a nuclear power plant operator violates one of the few regulations that are not already exempted, the NRC is reluctant to impose any fine or other penalty.[9]

32.     It should come as no surprise, then, that the regulatory environment at SONGS is ineffectual. Once again, the NRC has repeatedly failed to exercise any meaningful oversight of SONGS and has abdicated its role to regulate the SONGS

---

[8] *See, e.g.*, Daniel Sullivan, *Regardless of Blame, the Days of Nuclear Power Are Numbered*, Sullivan Solar Sentinel (June 7, 2013), https://www.sullivansolarpower.com/about/solar-power-blog/daniel-sullivan/san-onofre-has-become-obsolete.

[9] *See* **Exhibit 3** (Amey, *NRC's Abdication of Responsibility*), at 3-5.

Defendants. The NRC rubberstamps requests by the SONGS Defendants, many of which have compromised safety in favor of profit. The following are just a sampling of NRC's abdication of its regulatory enforcement mandate, and the prioritization of the needs of the SONGS Defendants over public safety.

### A.   NRC refuses to independently review recommendations from SONGS Defendants

33.   During the decommissioning of SONGS Unit 1, a concerned citizen sent a petition to the NRC on September 27, 2002, requesting that it suspend decommissioning efforts until after it "completes an *independent review* and evaluation of materials . . . pertaining to the seismic design basis of SONGS." (emphasis added). The NRC originally refused to provide any additional analysis for procedural reasons; however, the Petition Review Board overruled the NRC and determined that the citizen's concerns "warranted further NRC attention." Despite the clear request for *independent review*, the NRC staff still delegated the review of the seismic risks to the SONGS Defendants and relied on their seismic hazard assessment to determine that further investigation was not warranted.[10]

### B.   SONGS Defendants frequently violated NRC rules and regulations

34.   On March 2, 2010, the NRC issued a letter reprimanding the SONGS Defendants for the hostile work environment that had been identified by multiple sources at SONGS from 2008 to 2009.[11] During that time period, the NRC received approximately 50 allegations related to the lack of a "safety conscious work environment," another 42 relating to retaliation (or fear of retaliation) for raising safety concerns, and three related to a lack of confidence in the Nuclear Safety Concerns Program. For the 2008 and 2009 reporting periods, the number of

---

[10] *See* NRC September 27, 2002 Letter Declining to Perform Independent Analysis of Seismic Safety, a true and correct copy of which is attached as **Exhibit 7.**

[11] *See* NRC's March 2, 2010 Letter Regarding Work Environment Issues at San Onofre Nuclear Generating Station – Chilling Effect, a true and correct copy of which is attached as **Exhibit 8.**

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

allegations raised on-sight at SONGS were *six times and ten times higher* than the industry median, respectively. Although the NRC had discussed these concerns with the SONGS Defendants during this period, the upward trend in allegations indicated that SONGS Defendants' corrective actions either were not implemented or did not lead to improvements to the work environment.

35.     Despite the SONGS Defendants' prolonged inability to correct the work environment, the NRC did not impose a single violation. Instead, the agency relied on the SONGS Defendants to (1) within 30 days, submit written plans to correct these concerns; (2) within 180 days, host a public meeting to discuss these issues; and (3) within 180 days, follow-up with a written evaluation of the effectiveness of these plans. Missing from this enforcement action was any meaningful oversight by the NRC. Moreover, the SONGS Defendants failed to adhere to the deadlines or make the corrections required by the NRC. As before, the NRC chose not to hold the SONGS Defendants responsible for these violations and instead accepted vague promises to "improve."[12]

36.     On February 14, 2013, the NRC determined that the SONGS Defendants had failed to provide complete and accurate information during their investigation and correction of an earlier deviation from NRC regulations and approved design specifications.[13] Specifically, in September 2011, the NRC determined that the steam supply piping for the auxiliary feedwater pump turbine was not adequately protected from potential flooding. After the SONGS Defendants determined that the equipment was still operable despite the design nonconformance and reported the same, the NRC made no effort to independently verify their conclusions. Instead, the agency permitted the SONGS Defendants to continue operating without the required flood

---

[12] *See* March 31, 2010 Response to NRC Mid-Cycle Performance Review Letter, a true and correct copy of which is attached as **Exhibit 9**.

[13] *See* San Onofre Nuclear Generating Station – NRC Integrated Inspection Report, Nuclear Reg. Comm. (Feb. 14, 2013), a true and correct copy of which is attached here as **Exhibit 10**.

protection.  Predictably, while performing a subsequent in-person investigation, the NRC determined that the equipment was not actually operable, concluding that "[SONGS Defendants] personnel, using inaccurate information, inappropriately determined that the [auxiliary feedwater pump turbine] was operable, the condition was not reportable, and the compensatory measures could be removed." Exhibit 10 (NRC Inspection Report), at 18. Despite this revelation, the NRC again did nothing.

### C.  Despite history of safety violations and toxic work culture, NRC continued to rubberstamp SONGS Defendants' requests for exemptions from the emergency response regulations

37.  On March 31, 2014, the SONGS Defendants requested several exemptions from the emergency response sections of the NRC's regulations. *See* Emergency Planning Exemption Request, S. Cal. Edison (Mar. 31, 2014), a true and correct copy of which is attached as **Exhibit 11**; *see also* 10 C.F.R. § 50.47. As the Senate Committee on Environment and Public Works noted at the time, these regulations were "designed to protect the surrounding communities from the consequences that events such as wildfires, earthquakes or terrorist attacks could cause." Despite this, the Committee recognized that the outlook was grim, because the "NRC has never once refused a request to terminate the emergency response measures designed to protect the safety of communities living near decommissioned reactors."[14] Unfortunately, the NRC remained true to form. On June 4 and June 5, 2015, the agency granted the requested emergency exemptions[15] and then further amended the SONGS emergency plan[16] to ensure that the SONGS Defendants were compliant with the NRC's now toothless emergency preparedness regulations.

---

[14]  Letter to Nuclear Regulatory Commission, Sen. Comm. Envir. Pub. Works (May 15, 2014). A true and correct copy of this letter is attached as **Exhibit 12**.

[15] Letter Granting Exemptions to Emergency Planning Requirements, Nuclear Reg. Comm. (June 4, 2015), a true and correct copy of which is attached as **Exhibit 13**.

[16] *See* Issuance of Amendments Regarding Changes to the Emergency Plan, Nuclear Reg. Comm. (June 5, 2015), a true and correct copy of which is attached as **Exhibit 14**.

38.     According to the NRC, the emergency exemptions were permitted because the SONGS Defendants' "emergency plan provides (1) an adequate basis for finding an acceptable state of emergency preparedness, and (2) reasonable assurance that adequate protective measures can and will be taken in the event of a radiological emergency." *Id.*  Despite the SONGS Defendants' lengthy history of deception and misrepresentation to the NRC, the agency was still content to rely on unverified and untested assurances that the SONGS facility was ready to handle an emergency.

39.     The NRC also issued a series of exemptions to requests by the SONG Defendants to use the decommissioning trust funds for purposes other than decommissioning activities. As discussed below, the decommissioning trust fund is comprised largely of ratepayer funds—ratepayers provided approximately $3.3 billion dollars to the $4.7 billion-dollar fund. These automatic exemptions from the promulgated regulations constraining how these funds may be used help explain why the cost to close SONGS is nearly 8 times higher than the NRC's highest estimated decommission cost.[17]  The following is a non-exhaustive list of exemptions from regulations that were meant to ensure that the SONGS Defendants provide adequate financial protection throughout the decommissioning process:

a.     February 2, 1983: NRC grants temporary exemption after discovering that the automatic cooling pool valves didn't meet design criteria. *See* Letter Granting General Design Criteria Exemption, Nuclear Reg. Comm. (Feb. 2, 1983), a true and correct copy of which is attached as **Exhibit 15**.

b.     September 28, 1984: SONGS Defendants secure an exemption to the criticality monitoring system, permitting only one criticality system for two nuclear reactors. *See* Letter Granting Criticality

---

[17] *See* Financial Assurance for Decommissioning, NRC.gov, https://www.nrc.gov/waste/decommissioning/finan-assur.html (last updated July 25, 2019) ("The NRC estimates costs for decommissioning a nuclear power plant range from $280-$612 million.").

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

1                          Monitoring System Exemption, Nuclear Reg. Comm. (Sept. 28,

2                          1984), a true and correct copy of which is attached as **Exhibit 16**.

3      c.   August 9, 1990: NRC grants an additional exemption from the

4          accident requirements. *See* Letter Granting Criticality Accident

5          Requirement Exemptions, Nuclear Reg. Comm. (Aug. 9, 1990),

6          a true and correct copy of which is attached as **Exhibit 17**.

7      d.   April 27, 1999: NRC grants an exemption from the mandatory

8          periodic reporting requirements of 10 C.F.R. § 50.71(e)(4). *See*

9          Letter Granting Emergency Preparedness Exemption, Nuclear

10         Reg. Comm. (Apr. 27, 1999), a true and correct copy of which is

11         attached as **Exhibit 18**.

12     e.   December 21, 2001: NRC grants an exemption from the

13         emergency preparedness exercise schedule. *See* Letter Granting

14         Emergency Preparedness Exemption, Nuclear Reg. Comm.

15         (Dec. 21, 2001), a true and correct copy of which is attached as

16         **Exhibit 19**.

17     f.   September 5, 2014: NRC grants exemptions from 10 C.F.R.

18         §§ 50.82(a)(8)(i)(A) and 50.75(h)(2), which allows the SONGS

19         Defendants to use decommissioning trust funds for purposes

20         other than decommissioning activities and without prior

21         notification to the NRC, respectively. *See* Letter Granting

22         Exemptions Regarding Use of Decommissioning Trust Funds,

23         Nuclear Reg. Comm. (Sept. 5, 2014), a true and correct copy of

24         which is attached as **Exhibit 20**.

25     g.   January 5, 2018: NRC grants an exemption to 10 C.F.R. §

26         50.54(w)(1), which requires the operator of a nuclear power plant

27         to maintain property insurance in the amount of $1.06 billion to

28         ensure adequate funds for decontamination and stabilization in

1    the event of an accident. This regulation was promulgated in
2    response to the Three Mile Island disaster and was meant to
3    prevent communities from bearing the costs of a nuclear power
4    plant operator's negligence. The NRC granted the requested
5    amendment and sanctioned the reduction of onsite liability
6    insurance from $1.06 billion to $50 million (in other words,
7    permitted a 95% reduction in the amount of onsite liability
8    insurance). *See* Issuance of Onsite Property Insurance Exemption,
9    Nuclear Reg. Comm. (Jan. 5, 2017), a true and correct copy of
10   which is attached as **Exhibit 21**.

11   40.    These actions by the NRC, individually and collectively, were arbitrary
12   and capricious and not founded upon any objective criteria or independent analysis.

13   **D.    NRC permits significant license amendments to allow and expand
14          the scope of decommissioning without meaningful public
          participation and in derogation of its regulatory mandates**

15   41.    On June 12, 2013, the SONGS Defendants certified to the NRC that they
16   permanently ceased operation of SONGS Units 2 and 3. Within two years of this
17   certification, the SONGS Defendants were required to submit several important
18   documents detailing the environmental impact, financial costs, and site-specific plans
19   for handling the transition from an active nuclear power plant to a fully
20   decommissioned site. The NRC has detailed regulations setting forth the parameters
21   for how such transitions must occur. Nuclear power operators must follow these
22   regulations unless the NRC grants an exemption in the form of a "License
23   Amendment."

24   42.    Because the original license granted to the SONGS Defendants was
25   narrow in scope—in that it only permitted them to operate the plant and temporarily
26   store spent nuclear fuel and waste—a license amendment would be necessary to
27   decommission the plant. However, when the SONGS Defendants decided to
28   permanently cease nuclear operations, they sought to utilize the nuclear power plant

for an entirely different purpose—that is, the long-term storage of spent nuclear fuel. Thus, the grant or denial of the SONGS Defendants' request for a license amendment was a matter of significant public concern, requiring an opportunity for meaningful public participation.

43.     Without meaningful public participation or an independent assessment, on July 17, 2015, the NRC granted the SONG Defendants' request for a license amendment and permitted the SONGS Defendants' to decommission the SONGS facility. A true and correct copy of the NRC's letter granting Edison's requested license amendment is attached as **Exhibit 22**. The NRC relied on the SONGS Defendants' own analysis instead of objective criteria or independent analysis. Edison has thus been able to present its internal, untested, and unchecked conclusions, without even a suggestion of an objective analysis or oversight.

44.     In addition, the NRC repeatedly approved the SONGS Defendants' numerous subsequent license amendments, regardless of the scope and magnitude of the proposed changes.[18]

## III.    RADIOACTIVE FUEL AND THE DECOMMISSIONING PROPOSAL

45.     The spent nuclear fuel located at the now defunct SONGS is extremely dangerous and lethal to humans and the environment. Indeed, the storage of spent nuclear fuel has been described as "a trash heap deadly for 250,000 years."[19] However, the storage technique used at SONGS for decades – wet storage pools, encased in hardened structures specifically designed for such purpose – are time-tested and do not involve the movement of dangerous waste.  In contrast, the storage

---

[18] *See, e.g.*, Letter Granting Further Emergency Planning Exemptions, Nuclear Reg. Comm. (Nov. 2017) (permitting the SONGS Defendants to replace the Permanently Defueled Emergency Plan with the ISFSI-Only Emergency Plan and the Emergency Action Level (EAL) scheme with the ISFSI-Only EAL scheme).  A true and correct copy of the letter is attached here as **Exhibit 23**.

[19] David Biello, *Spent Nuclear Fuel: A Trash Heap Deadly for 250,000 Years or a Renewable Energy Source?*, Sci. Am. (Jan. 28, 2009), https://www.scientificamerican.com/article/nuclear-waste-lethal-trash-or-renewable-energy- source.

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

plan being executed by Defendants involves removing waste from the relative safety of the wet storage pools, transporting it around the SONGS site, shoving it into thin canisters, and burying in tombs that cannot be observed or accessed after sealing.

46.     Spent nuclear fuel is particularly dangerous because it contains massive amounts of Cesium 137, a radioactive isotope (or a radioisotope) created as a byproduct of the nuclear fission process at nuclear power plants.[20] Each of the 73 canisters that are intended to be buried at SONGS can hold more Cesium 137—as well as dozens of other fission byproducts, including the radioactive isotopes of Plutonium 239 and Strontium 90—than was released during the entire Chernobyl disaster.[21] Exposure to Cesium 137 can have dire consequences, including chemical burns, acute radiation sickness, cancer, and death. *See* CDC, *supra* note 20. The Cesium 137 in these canisters has a half-life of approximately 30 years—meaning that the radioactivity is halved every 30 years.[22] However, even after six half-lives (or 180 years), Cesium 137 remains radioactive and potentially deadly. More importantly, many of the other radioisotopes in the SNF are deadly, not only because of their radiation levels, but also as a result of their toxicity. And unlike radiation, toxicity has no half-life: a toxic substance remains toxic forever.

47.     Many of the spent fuel assemblies radiate heat at a temperature of at least 750 degrees Fahrenheit. This is the highest temperature allowed for fuel assemblies to be placed in a "dry cask." To put this in context, human hair vaporizes

---

[20] *Radioisotope Brief: Cesium-137 (Cs-137)*, CDC, available at https://www.cdc.gov/nceh/radiation/emergencies/isotopes/cesium.htm (last updated Apr. 4, 2018).

[21] *See* Donna Gilmore, *NRC Meeting on Defective San Onofre Holtec Nuclear Waste Storage System* (Jan. 24, 2019), https://sanonofresafety.org/2019/01/23/1-24-2019-nrc-meeting-on-defective-san-onofre-holtec-nuclearwaste-storage-system.

[22] Half-life is defined as the "length of time it takes for an isotope to become half as radioactive as it was when it was first created." *See* CDC, https://www.cdc.gov/nceh/radiation/emergencies/glossary.htm#h (last updated Apr. 4, 2018).

1   and spontaneously combusts at 453 degrees Fahrenheit. And spent nuclear fuel also

2   continues to emit radiation ***through*** even fully-functional canisters.

3       **A.**    **The decommissioning undertaken by the SONGS Defendants**

4           **involves burying radioactive nuclear fuel in defective and**

        **damaged canisters, on a fault line, 108 feet from the ocean, in a**

5           **tsunami zone, near heavily populated areas.**

6         48.    SONGS' current decommissioning plan calls for the burial of spent

7   nuclear fuel onsite in a containment system that stores the spent fuel canisters nearly

8   20 feet underground. This containment system, also referred to as the Independent

9   Spent Fuel Storage Installation ("ISFSI"), is improvidently located in a tsunami

10  inundation zone,[23] between two seismic fault lines,[24] and a mere 108 feet from the

11  Pacific Ocean. The dangers of storing spent nuclear fuel in such a location are not

12  speculative, as shown by the disaster at the Fukushima Daiichi nuclear power plant

13  in Japan.  Figure 1, below, depicts the location of the SONGS ISFSI in relation to the

14  Pacific Ocean:

15

16

---

17  [23] In June 2009, the California Emergency Management Agency collaborated with

18  the University of Southern California Tsunami Research Center to identify the
tsunami hazard posed to the San Onofre area, including SONGS. According to this

19  map, SONGS was located entirely within the tsunami danger area. A true and correct
copy of the June 2009 San Onofre Tsunami Inundation Map is attached as **Exhibit**

20  **24**.

[24] The two fault lines sandwiching SONGS are the Newport-Inglewood-Rose-

21  Canyon Fault and the Cristianitos Fault, both which are well known to the SONGS
Defendants.  Indeed, SD&EG discussed the two faults before admitting that both

22  the area surrounding SONGS as well as the "San Diego County area [are] subject to
strong seismic shaking from regional earthquakes that may take place on active

23  faults that occur in the region." *See* April 2016 SDE&G Environmental Assessment
at 7–8, a true and correct copy of which is attached as **Exhibit 25**. Furthermore,

24  research performed recently indicates that the Newport-Inglewood-Rose-Canyon
Fault is lengthier and more dangerous than previously thought: modeling suggests

25  that ruptures along this fault could produce a 7.4 magnitude earthquake—classified
as a "major" earthquake that causes "serious damage."  *See* Sahakian et al., *Seismic*

26  *Constraints on the Architecture of the Newport-Inglewood/Rose Canyon Fault:*
*Implications for the length and magnitude of future earthquake ruptures*, 122 J.

27  Geophys. Res. Solid Earth 2085, 2103–2104 (2017) (a true and correct copy of
which is attached as **Exhibit 26**); *see also Earthquake Magnitude Scale*, UPSeis,

28  http://www.geo.mtu.edu/UPSeis/magnitude.html (last visited July 22, 2019).

1
2
3
4
5
6
7

Figure No. 1



8     49.     The ISFSI, which is meant to house 3.6 million pounds of deadly spent

9  nuclear fuel produced at SONGS, is only about 18 feet above the Pacific Ocean's

10  median high tide. The bottom of the structure is a mere three feet above the

11  underground water table. Figure 2, below, illustrates this precarious situation:

12

Figure No. 2

13
14
15
16
17



18
19
20
21
22
23
24

25     50.     On information and belief, there has never been a truly independent risk

26  assessment of the decommissioning plans advanced by the SONGS Defendants

27  regarding the burying of the waste in this naturally volatile area or in the canisters

28

designed by Holtec. If any objective assessment was performed, it has been kept secret from the public.

51.     Climate-change experts predict that the bottom of each silo located in the ISFSI will be inundated with salt water as early as 2035, due to continuously rising sea levels.[25] The ISFSI is comprised of numerous cavities made of carbon steel, which are each designed to hold a single nuclear fuel canister. If sea levels rise at the rates predicted, the results could be catastrophic. The slow-moving ocean water would rust the ISFSI's carbon steel cavities as the briny salt water ebbs and flows with the tide.

**B.     The selection of defective and dangerous Holtec canisters.**

52.     As detailed more fully below, the selection of Holtec as the supplier of the SNF containment system (i.e. ISFSI and SNF canisters) was done either recklessly or in conscious disregard for the integrity, safety, and competence issues that have swirled around Holtec for many years (and continue to plague Holtec, as well as cause consternation in the communities where Holtec operates). Rather than independently reviewing the safety of Holtec's products and its decommissioning process, the NRC deferred to Holtec and the SONGS Defendants' safety assessment, in derogation of its obligations. As a result, NRC's decision to grant a License Amendment cannot be described as anything other than arbitrary, capricious, or otherwise contrary to law.

---

[25] *See generally* Anne C. Mulken, *Sea Level Rise Will Threaten Thousands of California Homes*, Sci. Amer. (June 18, 2018), www.scientificamerican.com/article/sea-level-rise-will-threaten-thousands-of-california-homes (discussing the projected damage by 2035 to the California coastal communities due to "chronic flooding" caused by rising sea levels); *Sea Level Rise Could Double Erosion Rates of Southern California Cliffs*, U.S. Geol. Sur. (July 9, 2018), https://www.usgs.gov/news/sea-level-rise-could-double-erosion-rates-southern-california-coastal-cliffs (predicting that erosion rates for coastal bluffs from "Santa Barbara to San Diego" will more than double by the end of the century).

## IV.   **DECOMMISSIONING DISASTERS**

53.   On January 31, 2018, the SONGS Defendants pushed forward with the decommissioning plan to bury spent nuclear fuel in Holtec canisters at the dangerous SONGS site. These decommissioning efforts were marred by a series of miscues, design flaws (and failures to adequately remedy these design flaws), lackadaisical managerial oversight, and attempts to conceal the same. Unsurprisingly, this behavior has caused SONGS Defendants to repeatedly fall short of the NRC's identified standards and promulgated regulations.[26] Among the many failures of the SONGS Defendants' decommissioning plan are the following:

### A.   **The Spent Nuclear Fuel is being buried in defective canisters.**

54.   Under the Decommissioning Plan, the SNF is to be transferred from the refrigerated "wet storage" holding pools and stored in 73 self-cooling "dry storage" canisters designed and manufactured by Defendant Holtec. Each and every one of the 73 individual canisters will contain more deadly radioactive Cesium-137 than was released globally during the Chernobyl disaster, as well as dozens of other radioactive and toxic fission byproducts. The failure of even one of these canisters will have calamitous consequences. Severe problems with this decommissioning plan make this nightmare scenario a real possibility.

55.   First, although the radioisotopes in each canister remain radioactive, toxic, and deadly for hundreds of years (and one, Plutonium-239, remains deadly for over 24,000 years), Holtec warrants the canisters for only 25 years. In other words, canisters designed and manufactured to contain and prevent injuries from spent nuclear fuel are not even guaranteed to function long enough for *any* of the stored radioisotopes to be transferred safely. Similarly, the system used to store the canisters in steel-lined, underground concrete holes in the ISFSI is guaranteed for a mere 10

---

[26] These standards include several of those produced by the American Society Mechanical Engineers (ASME), such as the standards for Boiler and Pressure Vessels (the standard allegedly applicable to the Holtec canisters). *See* March 2019 Community Engagement Panel Transcript at 165:23-167:1, a true and correct copy of which is attached as **Exhibit 27**.

years. Nevertheless, there is currently no viable plan for the transfer of the spent nuclear fuel within the 10-year (for the transfer of the canisters to a permanent storage location) or 25-year period (for the transfer of spent nuclear fuel from the "temporary" Holtec containers to the replacement containers) warranty periods. *See* Holtec Warranty Provisions, a true and correct copy of which is attached as **Exhibit 28**. Significantly, no independent risk assessment has been done concerning what is and what is not covered by the Holtec warranty,[27] or of the potentially deadly activities involved with the inevitable removal of the canisters from the ISFSI and/or transfer of the spent nuclear fuel from these "temporary" canisters to "permanent" replacements. Moreover, there is no publicly available analysis concerning Holtec's financial profile to ensure that—should there be a warranty failure—the company would have the financial capabilities to honor its warranties.

56.     <u>Second</u>, the design of the Holtec canisters the SONGS Defendants are using to store the spent nuclear fuel deviates from the acceptable minimum safety thresholds required for the design and manufacture of nuclear waste storage containers. Holtec canisters have so-called "thin-wall" canisters with only a 5/8-inch thick stainless-steel wall with an aluminum egg-crate structure designed to hold up to 37 spent fuel assemblies. Figure 3, below, is an image of the Holtec canister.

<u>Figure No. 3</u>



---

[27] There also has there not been any financial analysis of Holtec to determine if it even has the financial capability of actually standing behind these warranties. The specter that California tax payers may, yet again, shoulder the bill for the SONGS Defendants' negligent conduct looms large.

57.     Unlike the "thin-walled" Holtec canisters used at SONGS, many international nuclear decommissioning projects employ thick-walled dry casks with anywhere between 9 and 18-inch thick walls.[28] These casks are made of lead, steel, concrete and/or copper to create a strong radiation barrier. Figure 4, below, includes two diagrams depicting such a cask, and comparison photographs between an industry standard canister (bottom left) and the deficient Holtec canister used at SONGS (bottom right):

<u>Figure No. 4</u>





---

[28] A leading alternative, the CASTOR thick-wall canister is the containment and transportation product of choice for the majority of decommission projects worldwide.  *See Castor*, Eur. Nuclear Soc'y, https://www.euronuclear.org/info/encyclopedia/castor.htm (last visited July 24, 2019).

58.    A comprehensive, independent risk analysis certifying the safety of the Holtec canisters (performed by the NRC, ASME, or another certifying organization) either does not exist, or is not available to the public for review or comment, thereby preventing meaningful public participation in the decommissioning process. Upon information and belief, no such independent risk assessment was ever performed. Rather, the NRC has blindly relied upon the SONGS Defendants and the Holtec canisters.[29]

59.    As discussed in further detail below: (i) Holtec's integrity has been questioned on multiple occasions, (ii) Holtec has been the subject of at least one criminal investigation related to its conduct decommissioning other nuclear power plants across the country, and (iii) Holtec's performance in the SONGS decommissioning to date has been defective at best. The NRC and SONGS Defendants' blind reliance on Holtec's representations that the canisters were tested (or tested adequately) and that they are safe for the designed purpose is not only reckless, putting the Plaintiff and the public at risk, it is in abrogation of the NRC's duties and responsibilities. *See, e.g.*, 42 U.S.C. § 2201(b) (requiring the NRC to "establish by rule, regulation, or order, such standards and instructions . . . as the Commission may deem necessary or desirable to promote the common defense and security or to protect health or to minimize danger to life or property"); 10 C.F.R. § 1.11 ("The [NRC] is responsible for . . . protecting public health and safety, protecting the environment, and protecting and safeguarding nuclear materials . . . . Agency functions are performed through standards setting and rulemaking; technical reviews and studies; ***conduct of public hearings***; issuance of authorizations, permits,

---

[29] This scenario is not unlike the Federal Aviation Administration's apparent blind reliance upon Boeing to ensure that its modifications to the 737 MAX were safe. *See generally*, Natalie Kitroeff, David Gelles, and Jack Nicas, *The Roots of Boeing's 737 Max Crisis: A Regulator Relaxes Its Oversight*, N.Y. Times (July 26, 2019), https://www.nytimes.com/2019/07/27/business/boeing-737-max-faa.html (chronicling FAA's abdication of responsibility and delegation of its regulatory authority to Boeing, allowing Boeing to make design and safety changes without FAA approval or oversight).

and licenses; ***inspection, investigation, and enforcement***; evaluation of operating experience; and confirmatory research.") (emphasis added).

60.     Third, not only are the Holtec canisters insufficiently shielded, but the first four canisters already loaded into the ISFSI at SONGS have broken shims (*i.e.,* the canisters are defective).

61.     The San Diego Union-Tribune ("Union-Tribune") and OC Register have reported extensively on these dangerously flawed Holtec canisters. According to the Union-Tribune's investigative team, the canisters' "new and improved" design mostly relates to the introduction of new so-called "stand-off shims." These shims were intended to enhance convection cooling of the hot fuel assemblies by creating additional space to allow cooling helium gas to flow throughout the canister so that the stored spent nuclear fuel does not over-heat. Left uncooled, spent nuclear fuel will heat up to the point of a critical—and deadly—nuclear reaction. As such, the updated Holtec shim design was an integral part of the canisters cooling system. Unfortunately, there is no mechanism to promptly and accurately detect whether a shim has failed once the spent nuclear fuel is lowered into the canister.

62.     On information and belief, neither the SONGS Defendants nor Holtec notified or sought pre-approval from the NRC regarding the design change to the Holtec canisters. Despite the SONGS Defendants' prior failure to seek pre-authorization for the design change to the replacement steam generators, along with the failure to seek pre-authorization before implementing the new canister design, the NRC has been reluctant to censure the SONGS Defendants for their repeated disregard of NRC regulations. For the failure to seek pre-authorization a civil fine was considered, but rejected.[30] There was certainly no disclosure to the public or opportunity for public comment.

---

[30] *See* Teri Sforza, *At San Onofre, NRC Rejects Fine Against Holtec for Design of Nuclear Waste Canisters Without Permission*, The Orange Cty. Reg. (Apr. 29, 2019), https://www.ocregister.com/2019/04/29/nrc-decides-holtec-does-not-

63.     The Union-Tribune's team learned that numerous stand-off shims being used in the new and improved canisters are defective because bolts, which are part of the design for the shims, are broken.[31] The defects were first identified on March 5, 2018, when the SONGS Defendants' own workers discovered that the Holtec canisters were defective. Specifically, the workers discovered that one of the empty Holtec canisters had a broken four-inch bolt on the inside.  However, this critical component failed inside this canister even ***before*** the SONGS Defendants loaded it with spent nuclear fuel.

64.     At a Community Engagement Panel Meeting on March 22, 2018, the SONGS Defendants admitted that four canisters with the defective shim design had already been filled with spent nuclear fuel and buried at SONGS. Perhaps even more alarming is the fact that at the same meeting, Tom Palmisano—the Chief Nuclear Officer at SONGS—made a stunning admission that there is no existing method for safely opening defectively designed canisters to see if the stand-off shims are broken in the four buried canisters.  Thus, the SONGS Defendants have no way of ensuring that the fuel assemblies and/or cooling systems have not been critically compromised. Palmisano admitted that it would be at least three years before the techniques necessary to unload and inspect a canister ***could possibly*** be developed:

> So nobody has unloaded a commercial canister, either a bolted cask or a welded cask or canister. . . . What you would do is basically have a mechanism, either to do it in a fuel pool or do it in a dry transfer facility. . . .  The real challenge as we would understand it today, and nobody has had to do it yet, is the reflood. Certainly, technically possible. What I would tell you is just I was back in Washington with the NRC last week, if you were just to brainstorm, ***this would probably be a two- to three-year project to develop the techniques***, pile up the techniques. The NRC would want to have explicit approval on this because of the ***radiological hazards***.

---

deserve-fines-for-canister-violations-at-san-onofre/.

[31] *See* Jeff McDonald, *Work Ceased for 10 Days at San Onofre After Loose Bolt was Discovered in Radioactive Waste Container*, San Diego Union Tribune (Mar. 24, 2018), https://www.sandiegouniontribune.com/news/watchdog/sd-me-nuclear-waste-20180324-story.html.

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

March 22, 2018 Community Engagement Panel Transcript at 85:16–86:18, relevant excerpts of which are attached as **Exhibit 29** (emphasis added). And yet, in his September 23, 2014 letter to the NRC transmitting the Post-Shutdown Decommissioning Activities Report ("PSDAR"), a true and correct copy of which is attached as **Exhibit 30**, Palmisano acknowledged that:

> As required by 10 CFR 50.82(a)(7), SCE will notify the Nuclear Regulatory Commission (NRC) in writing before performing any decommissioning activity inconsistent with, or making any significant schedule change from, those actions and schedules described in the PSDAR, including changes that significantly increase the decommissioning cost.

*Id.* at 8.  It appears that Palmisano's oral statement in March 2018 was the first time the SONGS Defendants had notified the public or the NRC that they had been engaged in decommissioning activity inconsistent with their prior representations to the NRC. On information and belief, the failure of the stand-off shim bolts in the four defective canisters evidences a high-degree of certainty that at least one shim in each of the fully loaded defective canisters will fail in a similar manner. Based on testimony of Krishna Singh, Holtec's CEO, Plaintiff estimates that there are approximately 50 broken shim bolts in four canisters that were downloaded with the defective shim design. Consequently, there is a very high probability that the four defective canisters are internally damaged and may overheat. The release of deadly radioactive material may thus be imminent.

65.     Perhaps more alarming than the SONGS Defendants' flippant response to their discovery that the "new and improved" Holtec canisters were defective, was the NRC's failure to act after it learned that the canisters defective, and that the SONGS Defendants had implemented the new design without the agency's oversight or pre-approval. The SONGS Defendants were permitted to continue loading Holtec's thin-walled canisters with spent nuclear fuel *as if nothing happened at all*. The SONGS Defendants' continued negligence—and the NRC's continued hands-

off regulatory approach—poses a serious risk of grievous harm to the people and environment surrounding SONGS.

**B.    The SONGS Defendants compromise the structural integrity of twenty-nine canisters it buried at SONGS.**

66.    On information and belief, the SONGS Defendants have consistently used less personnel than necessary to ensure that the Holtec canisters are safely and effectively loaded into the ISFSI. For example, SONGS Defendants have employed an inadequate number of "spotters" at different vantage points, resulting in limited visibility of the canister as it is being loaded into its enclosure. This negligent deviation from safe fuel-handling procedures has already caused substantial harm to the millions of people around the SONGS facility.[32]

67.    On information and belief, and as revealed in NRC documents and noted at public hearings, the SONGS Defendants negligently gouged and then buried twenty-nine (29) fully loaded canisters at SONGS. Experts believe that this gouging may lead to deeper, through-the-wall cracks, which will make the future safe movement of these canisters impossible (despite the fact that the safety of the canisters storage location is only warrantied for 10 years). Experts also point out that damage to the canisters will be exacerbated, *inter alia*, by the presence of salt air, fog, rain, and salt water—the precise weather conditions that the canisters will be exposed to at the current location just steps from the Pacific Ocean.

68.    Upon information and belief, many (if not all) of the canisters were negligently scratched during transportation to the ISFSI. According to an NRC inspection report, and as admitted at a Community Engagement Panel Meeting by NRC spokesperson Scott Morris, **every single canister was damaged** during the downloading process: "The canister involved in the near-drop event [and] all the

---

[32]    *See* San Onofre Nuclear Generating Station, Final Enforcement Action and Follow-Up Inspection Preliminary Results Presentation at 18-21, Nuclear Reg. Comm. (Mar. 25, 2019), a true and correct copy of which is attached here as **Exhibit 31**.

other canisters . . . experienced a little bit of scuffing, and a little bit of contact going into the ISFSI." *See* November 8, 2018 NRC Meeting Transcript at 77–78, an excerpt of which is attached as **Exhibit 32**. Upon information and belief, neither the SONGS Defendants nor the NRC has independently evaluated the increased risks posed by this damage to the canisters during transportation.[33]

C.     **The SONGS Defendants nearly dropped two 49 ton canisters full of deadly radioactive nuclear waste and attempt to cover it up.**

69.     On July 22, 2018, the SONGS Defendants nearly dropped a 49-ton canister full of deadly radioactive nuclear waste more than 18 feet into the ISFSI when it was caught on a quarter inch thick steel guide ring. The SONGS Defendants referred to this event as an "unsecured load event." In actuality, this event could have turned San Onofre State Beach Park into a permanently uninhabitable nuclear wasteland.

70.     Pursuant to 10 C.F.R. § 72.75, any incident involving nuclear waste **must** be reported to the NRC within **twenty-four hours**, yet the July 22 failure was not formally reported on the NRC's Event Notifications Report. The sole purpose of 10 C.F.R. § 72.75 is to insure that potentially hazardous events are promptly reported and investigated and to allow for public disclosure of potential safety risks.

71.     Despite the regulation's clear obligation to provide a formal written report for events of this nature, the SONGS Defendants **never** provided a formal report for the July 22 unsecured load event. As a result, the public was kept in the dark about the potentially disastrous incident in July.

---

[33]   Despite the SONGS Defendants' efforts to downplay the significance of the gouging found on Holtec canisters, the potential consequences are staggering. Holtec's CEO admitted as much during a public meeting, acknowledging that even a microscopic crack in a canister is enough to cause a release of "millions of curies of radioactivity." *Dr. Kris Singh, CEO, Holtec International, on Dry Canister Nuclear Waste Storage*, YouTube (Oct. 14, 2014), at 31:04-34:30(at https://www.youtube.com/watch?v=s5LAQgTcvAU) (transcript excerpt at **Exhibit 33).**

72. Ten days later, on August 3, 2018, the SONGS Defendants once again lost control of a 49-ton canister full of deadly radioactive nuclear waste while it was being lowered into a below-ground storage silo. While moving the canister, the Defendants' employees snagged the 49-ton canister on the same quarter-inch wide steel flange that captured the canister during the July 22 event. The SONGS Defendants' personnel did not realize that the equipment holding the canister had been caught on the flange.

73. Plaintiff discovered the August 3 near-miss when a whistleblower, David Fritch, came forward and publicly reported the event six days later during the August 9 Community Engagement Panel Meeting. Prior to the whistleblower's disclosure, the SONGS Defendants' representative did not disclose the August 3 "near-miss" disaster when discussing the work stoppage put in place after the event. In fact, Edison's then Vice President and Chief Nuclear Officer, Palmisano, affirmatively misled the public and misrepresented that the work stoppage was a planned stop so that they could perform necessary maintenance, provide employees with time off, and analyze the overall efficiency and effectiveness of the decommissioning process at that point.

74. However, during the public comment portion of the event, Fritch (a Safety Professional employed as a contractor at the SONGS facility) disclosed the misconduct as the actual cause for the work stoppage. Fritch informed the public about the near-miss event of August 3rd, and directly contradicted the SONGS Defendants' public statements that the work stoppage was a "planned event."

75. Fritch's whistle-blowing sparked widespread media attention on the safety hazards posed by the Defendants' negligence at the facility. This alone should have prompted the NRC to perform a professional and independent risk assessment to determine the actual risks at the site, and take appropriate remedial steps to avoid or minimize future risks. Again, the NRC abdicated its responsibilities and continued to do nothing to protect the public or adequately monitor the situation.

76.     Once again, the SONGS Defendants failed to issue a NRC Event Notification Report within twenty-four hours of the Friday, August 3 event as required the NRC's regulations. Instead, the SONG Defendants waited more than six weeks to report the incident. Moreover, rather than submitting the legally required written report, the SONGS Defendants waited until Monday, August 6, to informally call the NRC. The SONGS Defendants' private phone call deprived the public not only of a written contemporaneous report of the near fatal disaster but prevented transparency of their actions at SONGS. Not only did this oral notification fail to comply with the NRC's own "Event Reporting Requirements" under 10 CFR § 72.75, it failed to notify the public. The NRC and SONGS Defendants thus attempted to keep the August 3 near-catastrophic-miss a secret.

77.     This concealment was not accidental. In fact, the July 22 and August 3 near-miss events occurred during a required public comment period for the California State Lands Commissions Draft Environmental Impact Report ("EIR") directly related to the SONGS decommissioning project. That period ran from June 28 until August 30. By delaying formal written notice of the events, the SONGS Defendants were able to avoid meaningful public participation in connection with the interrelated EIR.

78.     Rather than taking precautionary steps to protect the public in light of the SONGS Defendant's demonstrated negligence, upon information and belief, the NRC completely deferred to the SONGS Defendants and blindly relied upon their assurances that everything was under control. Indeed, the NRC went so far as to summarily reject a written request by Congressman Mike Levin for the installation of permanent NRC inspectors at the facility.[34]

79.     On August 17, 2018, in response to the August 3 "near-miss," the NRC issued an Inspection Charter for SONGS, which found five violations that were

---

[34] *See* Letters between Hon. Mike Levin and NRC Chairman Kristine L. Svinicki (June 21, 2019 and July 16, 2019), attached hereto as **Exhibit 34**.

ultimately penalized the imposition of a wrist-slapping fee of $116,000 on Edison. Perhaps more troubling, the NRC has not required the SONGS Defendants to file an Event Notification Report for the July 22 event, and has ignored their flagrant violation of federal law for not filing an Event Notification Report for 47 days after the August 3 event.

80.     On information and belief, instead of ordering the SONGS Defendants to cease operations at SONGS, NRC accepted the SONGS Defendants' "verbal commitment" to discontinue loading until the NRC issued its final Inspection Report.

**D.     Holtec's history of unlawful activities.**

81.     As set forth more fully above in Paragraphs 48 through 69, Holtec negligently designed, manufactured, and deployed defective nuclear waste canisters at SONGS. As shown below, Holtec has a long history of misconduct involving bribery of public officials and failing to disclose material information to government agencies.

82.     In October 2010, Holtec was suspended by the Tennessee Valley Authority ("TVA") for two months and fined $2 million after a federal criminal investigation conducted by the Office of the Inspector General found that Holtec had bribed an employee of the TVA. According the TVA:

> The OIG initiated a first in TVA history; the debarment of a contractor doing business with TVA. In October 2010, TVA debarred Holtec International, Inc., based on the results of a criminal investigation conducted by the OIG. Because of our recommendation, TVA created a formal suspension and debarment process and proceeded to debar Holtec for 60 days.[35]

83.     Because Holtec concealed its 2010 debarment and fine in a sworn certification submitted as part of Holtec's application to receive tax breaks for relocating to New Jersey, the State of New Jersey later froze millions of dollars that

---

[35] Office of the Inspector General, Tennessee Valley Authority, Semiannual Report (Oct. 1, 2010 – March 31, 2011) at 8, 35 (available at https://oig.tva.gov/reports/semi50.pdf); *see also* supra note 4 and Exhibit 1.

were to be sent to Holtec. According to the News Jersey Governor's Task Force on EDA Tax Incentives,   Holtec received $260 million in tax benefits based on its false claim that it had not been previously debarred.[36]

84.     And, as set forth in detail below, the NRC recently issued two violations to Holtec concerning its conduct at SONGS. The cumulative impact of Holtec's violations should have given the NRC pause when relying on Holtec to safely and effectively decommission SNF at SONGS.

E.     **The NRC confirms the SONGS Defendants and Holtec's negligence, but fails to protect citizens or environment from the consequences.**

85.     On August 24, 2018, the NRC issued an Inspection Report to the SONGS Defendants. In the Report, the NRC determined that Edison had committed a Severity Level IV violation of the NRC's safety requirements between June 2017 and June 2018.  The violation related to the design control of field changes made to the safety equipment the SONGS Defendants used to load SNF into storage canisters. Plaintiff is informed and believes, and on that basis alleges, that the violation involved the lack of industry-standard training for in-field personnel responsible for conducting the loading activities at SONGS.

86.     At no point in time did the NRC inspect or engage an independent third party to inspect the canisters involved in the two unsecured load events set forth above to determine if they were damaged. Instead, NRC allowed Edison itself to inspect, assess the damage, and report on the extent of the damage to the canisters filled with SNF.  At a minimum, the NRC was obligated to ensure by ***direct observation and verification*** that the storage canisters were safe.[37]

---

[36] *See supra* note 4 and Exhibit 2.

[37]    Instead, at a Community Engagement Panel on June 5, 2019, the SONGS Defendants claimed to have developed a robotic camera system for inspecting scratches on the canisters. According to a white paper prepared by the SONGS Defendants in May 2019, the maximum depth of the gouges on seven of the inspected containers was 0.026 inches.  *See* Analysis of the Effects of Incidental Contact to Multipurpose Canisters During the Downloading Process, S. Cal. Edison (May

87.     On November 29, 2018, the NRC issued an Inspection Report to Holtec in which it "assessed the adequacy of Holtec's activities with regard to the design of spent fuel storage casks" as compared with the requirements. 10 C.F.R., Part 72. The NRC's Report informed Holtec that it was being considered for "Escalated Enforcement Action" for two apparent violations, Violation A and Violation B.

88.     The NRC's Violation A involves Holtec's "failure to establish adequate design control measures as a part of the selection and review for suitability of application of materials, parts, equipment, and processes that are essential to the functions of the structures, systems, and components which are important to safety, in accordance with 10 CFR 72.146(a), 'Design control.'" On information and belief, Violation A relates to the faulty design of Holtec's canisters which resulted in an estimated 51 broken bolts (known as "shim standoffs") in the first four canisters deployed at SONGS.

89.     The NRC's Violation B involves Holtec's "failure to perform a 10 CFR 72.48 evaluation when required." According to 10 CFR § 72.48 ("Changes, tests, and experiments"), vendors and utilities are required to register certain unapproved design changes with the NRC in advance of deploying those changes. If Holtec had notified the NRC of its design change to the canister, it could have been forced to undergo a costly and time-consuming design review and risk assessment. Upon information and belief, Holtec failed to provide the NRC with prior notification of its design changes because it wanted to avoid the costly delays that would have accompanied such action.

90.     On March 16, 2019, Holtec's CEO, Krishna Singh, sent a letter entitled "Request for Urgent Meeting" to the Director of Spent Fuel Management Office of Nuclear Material Safety and Safeguards at the NRC. Singh's letter referenced a

_____

2019), a true and correct copy of which is attached as **Exhibit 35.** Upon information and belief, the NRC has not directly observed or verified this claim, or evaluated the extent to which these gouges undermine the safety of the storage canisters.

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

damaged Holtec canister at SONGS (Number 29). The letter requested that the public be allowed to attend the meeting and claimed that "**The loaded transfer cask stranded inside the Fuel Building is one of several compelling reasons that beckon us for an urgent regulatory engagement**." (emphasis added).

91.    On March 25, 2019, the NRC issued a "Notice of Violation" and "NRC Special Inspection Report" to Edison for two safety violations that occurred at SONGS on August 3, 2018 (the date of the unsecured load event). Violation A" was a failure to make certain that safety equipment was operating; Violation B was a failure to report the safety incident to the NRC. Although the NRC had a wide variety of permissible sanctions—including debarment from federal government contracting—the agency choose a wrist-slapping financial sanction of a mere $116,000.

92.    To put this "fine" in perspective, and upon information and belief, Edison's total operating revenue for 2018 was $6,560,000,000. Edison's CEO and Senior Vice President, Kevin M. Payne, received $3,088,108 in compensation for the 2018 fiscal year, while its President and Senior Vice President, Ronald O. Nichols, received $1,187,536 in total compensation. A fine of $116,000 was not even a tenth of the salary for Edison executives, and completely inconsequential to Edison's annual earnings.

93.    As a result of these "near misses" at the hands of the SONGS Defendants, the citizens of San Diego and Southern California have been and remain in danger of a nuclear disaster.  Given the SONGS Defendants' track record, the continued operation of the current decommissioning plan presents an imminent danger to the Plaintiff, the public, and the environment of Southern California. The prevention of these clear and present dangers precipitated the filing of this Complaint and weigh in favor of granting the relief Plaintiff requests below.

# FIRST CAUSE OF ACTION

## (Violation of the Administrative Procedure Act, 5 U.S.C. § 702)

## (Defendant NRC)

94.     Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 94 as though fully set forth herein.

95.     By letter dated July 2015, the NRC unilaterally granted the SONG Defendants' request to amend its license (the "License Amendment") so that they could decommission the SONGS facility. *See* Exhibit 22. Pursuant to the Atomic Act of 1954, 42 U.S.C. § 2011 *et seq.*, the License Amendment must comply with the statutory and regulatory mandates applicable to the NRC. The NRC's grant of the SONG Defendants' application for a License Amendment was in violation of the Administrative Procedure Act, Pub. L. 79–404, 60 Stat. 237, codified at 5 U.S.C. §§ 500, *et seq.*

96.     The NRC's License Amendment, as promulgated, is a final enactment, subject to immediate challenge and action by reason of current, subsisting, and binding effect.

97.     The NRC, the agency responsible for administrative oversight and management of nuclear facilities (including the decommissioning of such facilities), issued the License Amendment utilizing a de facto adjudicative rule-making procedure, requiring it to fulfill the procedural adjudicative rule-making requirements of 5 U.S.C. §§ 556, 557.

98.     The NRC has failed to fulfill the procedural adjudicative rule-making requirements of 5 U.S.C. §§ 554, 556, 557 by, inter alia:

a.     Failing to give all interested parties an opportunity to submit facts, arguments, and evidence to be duly considered by the administrative agency prior to promulgation of the License Amendment;

b.  Failing to provide an opportunity for a hearing on the issues presented in the License Amendment despite a request for the same;

c.  Failing to provide an opportunity for a hearing on the issues presented in the License Amendment despite knowledge of the existence of evidence that contradicts fundamental scientific assumptions on which the License Amendment is based; and

d.  Failing to provide an opportunity for a hearing on the issues presented in the License Amendment despite knowledge of the existence of evidence directly bearing on considerations of public safety and environmental concerns related to the decommissioning at SONGS.

99.  The License Amendment is contrary to and in excess of authority of law, and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law in the following ways, among others:

a.  The License Amendment fails to conform to the requirements of NRC regulations, including 10 C.F.R. Parts 30, 40, 50, 70, and 72;

b.  Permitting storage of spent nuclear fuel in a manner which is unsupported by independent science or study;

c.  Permitting conditions at variance with, in excess of, or not reasonably contemplated by or necessary under NRC regulations, including 10 C.F.R. Parts 30, 40, 50, 70, and 72;

d.  Improperly altering and amending substantive portions of NRC Regulations, including 10 C.F.R. Parts 30, 40, 50, 70, and 72;

e.  Basing the License Amendment on flawed and unreliable scientific studies and public surveys;

f.   Failing to take into account, rely on, or incorporate previous agency studies and scientific undertakings in making administrative determinations;

g.   Failing to adequately or meaningfully reflect the public record of proceedings associated with prior agency action and scoping process undertaken in advance of promulgation of the License Amendment; and

h.   Including factual statements and conclusions in the License Amendment which are not borne out by scientific studies or validly reported surveys.

100.   The NRC, by its authority to promulgate the License Amendment, has acted contrary to and in excess of its authority delegated in the following manner:

a.   Failing to maintain an adequate, complete, and meaningful public record;

b.   Failing to evaluate and devote expertise to the evaluation of scientific studies performed at its instruction and behest;

c.   Failing to evaluate and devote expertise to the evaluation of public use polls and data performed and/or gathered at their instruction and behest; and

d.   Failing to oversee the decommissioning of SONGS in accordance with requirements of the Atomic Act of 1954 and NRC regulations.

101.   The failures, omissions, and actions as set forth were undertaken by Defendants in violation and contravention of obligations incumbent by operation of law or in excess of duly delegated authority.

102.   The failures, omissions, and actions as set forth were undertaken by one or more Defendants improperly or in bad faith for reasons unknown to the Plaintiff.

## INJUNCTIVE RELIEF ALLEGATIONS

103.   If an injunction does not issue enjoining the NRC from allowing the SONGS Defendants to proceed with the decommissioning as provided for in the License Amendment, Plaintiffs and the public will be irreparably harmed.

104.   Plaintiffs has no plain, speedy, and adequate remedy at law.

105.   If not enjoined by this court, the NRC will continue to allow the Nuisance enforce or rely on the License Amendment as adopted in derogation of Plaintiffs' and the public's rights. Accordingly, injunctive relief is warranted.

## SECOND CAUSE OF ACTION

### (Public Nuisance, Cal. Civ. Code §§ 3479-3480)

### (Defendants Edison, SDG&E, Sempra, and Holtec)

106.   Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1-94 as though fully set forth here.

107.   The activity of the Defendants Edison, SDG&E, Sempra, and Holtec (hereinafter collectively the "Nuisance Defendants"), and their failure to act, as alleged herein, has created conditions that are harmful to the health of the entire community of the Southern District of California, and obstructed the free use of the property adjacent to SONGS so as to interfere with the comfortable enjoyment of life and property in the community. A substantial number of people in Southern California are negatively impacted by these conditions at the same time, and their annoyance at (and disturbance by) these conditions is objectively reasonable. These activities constitute a public nuisance under California Civil Code §§ 3479-3480. The Nuisance Defendants, and each of them, caused, created, and assisted in the creation of the alleged nuisance.

108.   The Nuisance Defendants, their agents and employees, have already handled and hazardous substances (SNF) with reckless disregard for human health, the environment, and for the peace, tranquility, and economic well-being of the

public. This negligent and reckless behavior resulted in the alleged nuisance. A non-exhaustive list of such behavior includes:

a. On or about August 3, 2018, the Nuisance Defendants were lowering one of the canisters containing spent nuclear fuel into a storage vault. There were insufficient supervisory personnel involved in the process in violation of NRC and industry standards. Safety personnel present did not notice that the container had been caught upon a flange inside the vault because the personnel could not actually see into the vault during the lowering process. This supervisory and procedural flaw in the process exacerbated the risks associated with an already dangerous activity. There was substantial slack in the equipment lowering the container, which could have fallen nearly 20 feet if the flange had not held. Luckily, the canister did not fall, and a catastrophe was avoided. Even still, the derogation from normal procedure caused an increase in the amount of radiation released into the environment while the canister remained perilously suspended in midair.

b. The Nuisance Defendants unilaterally decided *not* to file an event notification report (due by regulation within 24 hours of the event) until more than *six weeks* after the near-catastrophe. As previously noted, applicable rules and regulations require licensees to file written event notification reports pertaining to potentially dangerous events *within twenty-four (24) hours*. Prompt notice of potentially dangerous, in this case catastrophic, events is integral to the safe and secure handling of spent nuclear fuel. The Nuisance Defendants' decision to file the event notification report more than a month *after* the event exposed the

Plaintiffs, the public, and the environment to significant risk. The net result was to increase the fear and mistrust already surrounding the Nuisance Defendants' handling of the ultrahazardous spent nuclear fuel at SONGS.

c.  On August 6, 2018, the Nuisance Defendants first informed the NRC of the "near miss" event by a "courtesy notification" to the NRC. As a result, the NRC chartered a team to conduct a special inspection of "[Nuisance Defendants]'s follow-up investigation, causal evaluation, and planned corrective actions regarding the near-miss drop event involving a loaded spent fuel storage canister at SONGS."[38]

d.  On November 28, 2018, the NRC published the findings from this investigation, in which the agency determined that the operators of SONGS violated *five* NRC requirements. Specifically, the Nuisance Defendants failed to: (1) ensure important-to-safety equipment was available to provide required drop protection features while the spent fuel canister was being moved to the storage facility; (2) provide timely notification of the August 3, 2018 failure to provide important-to-safety equipment; (3) establish measures to ensure that conditions adverse to quality, such as failures, malfunctions, deficiencies, and deviations are promptly identified and corrected; (4) establish a program for training, proficiency testing, and certification of independent fuel installation personnel; and (5) provide documented instructions

---

[38] *See* NRC Inspection Charter to Evaluate the Near-Miss Load Drop Event at the San Onofre Nuclear Generating Station (August 17, 2018), at 1-2. A true and correct copy of which is attached as **Exhibit 36**.

or procedures sufficient to ensure that important activities are satisfactorily accomplished.[39]

e.  Upon information and belief, another investigation into the event was conducted on February 25-28, 2019, and the NRC issued its final ruling regarding these violations on March 25, 2019.

109.  Unless restrained by this Court, the Nuisance Defendants intend to and will continue to maintain the nuisance by failing to investigate and replace the substandard canisters, which are currently used to store SNF. Worse still, the Nuisance Defendants intend to store additional SNF in these substandard canisters, despite the well-known defects that render these canisters insufficient for the task.

110.  The Nuisance Defendants' proposed remediation plan represents a substantial increase to the substantial and unreasonable interference with the collective rights of the Plaintiffs and the public. The storage of spent nuclear fuel in substandard containers threatens the health and property rights all those living or working near the temporary storage area, including the major metropolitan areas of San Diego, Irvine, Riverside, San Clemente, and others. Should any of the nuclear waste containers be dropped, crack, rust, or otherwise malfunction, nuclear material would migrate through soil and wind, irreparably harming the land and any person unlucky enough to be exposed. The nuclear waste would spread quickly with irreparable and significant injury occurring instantly.

111.  The social utility of Defendants' proposed remediation plan is outweighed by the gravity of the harm threatened. As discussed above, safer and more well-established methods for storing spent nuclear fuel exist. By choosing a plan that prioritizes profits over safety, Defendants have increased the gravity of harm posed

---

[39] *See* NRC Special Inspection Report 050-00206/2018-005, 050-00361/2018-005, 050-00362/2018-005, 072-00041/2018-001 and Notice of Violation (Nov. 28, 2018), a true and correct copy of which is attached as **Exhibit 37**.

by the decommissioning of SONGS far beyond any threshold justifiable by the "social utility" of Defendants' plan.

112. Defendants' actions are especially injurious to Plaintiff Public Watchdogs, since the organization's mission is to ensure that government agencies and special interests comply with all applicable laws, including public safety and environmental-protection laws, especially in the public-utilities industry. Defendants' remediation plan is in violation of applicable laws and regulations, and allowing the Nuisance Defendants to move forward would permit the exact type of public safety and environmental harms that Public Watchdogs was created to prevent. Thus, Public Watchdog has suffered and continues to suffer from the type of harm that is different from the harm suffered by the general public, and the Nuisance Defendants conduct is a substantial factor in causing this harm. Public Watchdog has not consented to the activities of the Nuisance Defendants, and have sought to discourage the Nuisance Defendants from going forward with their ill-conceived and poorly-executed plans. Therefore, Plaintiff Public Watchdog is entitled to bring this civil action against the public nuisance created by the Nuisance Defendants pursuant to Cal. Civ. Code §§ 3491, 3493.

## INJUNCTIVE RELIEF ALLEGATIONS

113. Unless the public nuisance activities of the Nuisance Defendants' remediation plan are restrained by a preliminary and permanent injunction, Plaintiffs and the citizens of the surrounding area will suffer great and irreparable injury in that additional nuclear waste will be stored in containers significantly more prone to malfunction. Even a slight malfunction in only one container would be disastrous, with the consequences comparable to Chernobyl.

114. Plaintiff has no adequate remedy at law for the injury being suffered by the Nuisance Defendants' public nuisance activities, because the damage posed by radiation exposure is severe, permanent, and fatal. Traditional civil remedies can provide no recourse capable of making the effecting communities whole.

### THIRD CAUSE OF ACTION

### (Strict Products Liability)

### (Defendant Holtec)

115.    Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1-95 as though fully set forth here.

116.    Holtec designed, tested, inspected, manufactured, marketed, recommended, sold, maintained, installed, assembled or otherwise put into the stream of commerce the Holtec canisters used during the decommissioning of SONGS.

117.    Holtec owed a duty to Plaintiff and California residents to design and manufacture the Holtec canisters in such a way that made the canisters safe for their intended purpose of long term storage of spent nuclear fuel at SONGS.

118.    Holtec knew or should have known while designing and manufacturing the Holtec canisters that they were defective and created an unreasonable risk of injury to Plaintiff and California residents when used to permanently store spent nuclear fuel at SONGS.

119.    Holtec was negligent in failing to properly design, manufacture, and assemble the Holtec canisters used to permanently store spent nuclear fuel at the SONGS ISFSI, thereby creating a clear and immediate risk of serious injury.

120.    The design of the Holtec canisters used during the decommissioning of SONGS is unreasonably dangerous.

121.    Holtec's misconduct set forth above constitutes an abnormally dangerous activity which exposes Plaintiff and California's citizens to an unreasonable risk of harm.

122.    At all relevant times, Holtec had control over the abnormally dangerous activity of designing, manufacturing, and assembling the Holtec canisters used to permanently store spent nuclear fuel at the SONGS ISFSI.

123.    As a direct and proximate cause of Holtec's defectively designed canisters, Plaintiff and the citizens of and visitors to California have suffered and will

suffer damage including, but not limited to, imminent threat of harm in the form of a catastrophic release of deadly nuclear waste.

### **PRAYER FOR RELIEF**

**WHEREFORE,** Public Watchdogs prays for judgment against Defendants, individually and collectively, as set forth below:

1. An Order declaring that the NRC violated the Administrative Procedure Act, 5 U.S.C. §§ 500, *et seq.*, by approving the SONGS Defendants' decommissioning plan, and directing NRC to stay decommission and to act in accordance with its regulatory obligations;

2. An Order requiring the NRC to perform its duties as set forth in the Administrative Procedure Act, including the meaningful oversight of the SONGS Defendants through independent testing and verification of the design, implementation, and longevity of Holtec's thin-walled canisters and the Independent Spent Fuel Storage Installation;

3. An Order declaring that the SONGS Defendants' proposed decommissioning plan constitutes a public nuisance and enjoining the SONGS Defendants from further harmful activity as provided for under the plan;

4. A full and complete accounting of the decommissioning trust fund to ensure that the funds collected are adequate to permit the safe decommissioning of SONGS;

5. Entry of a temporary restraining order and preliminary injunction enjoining further decommissioning efforts to prevent immediate and irreparable harm until a full hearing can be conducted on the decommissioning plan;

6. The appointment of an independent monitor at SONGS to provide independent oversight and accountability regarding the decommissioning taking place at SONGS;

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

7.     Attorney's fees to the full extent permitted by law;

8.     Prejudgment interest to the full extent permitted by law; and

9.     For such other and further relief as the Court deems just and proper.

Dated:  August 29, 2019                 **BARNES & THORNBURG LLP**

By: /s/ Charles G. La Bella
Charles G. La Bella
Attorneys for Plaintiff
Public Watchdogs

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all issues herein.

Dated:  August 29, 2019                    **BARNES & THORNBURG LLP**


By: /s/ Charles G. La Bella
Charles G. La Bella
Attorneys for Plaintiff
Public Watchdogs