# EXHIBIT 1

**TVA RESTRICTED INFORMATION**



**Office of the Inspector General**
**Report of Administrative Inquiry**

March 23, 2010

William R. McCollum, Jr., LP 6A-C
Ralph E. Rodgers, WT 6A-K

(b) (7)(C)
(b) (7)(C)
HOLTEC INTERNATIONAL
555 LINCOLN DRIVE WEST
MARLTON, NEW JERSEY 08053
OIG FILE NO. 12E-102

This report was prepared at the request of Ralph E. Rodgers, Deputy General Counsel, Office of the General Counsel, Tennessee Valley Authority (TVA), to summarize investigative and audit efforts concerning the actions of (b) (7)(C) . These efforts were initiated following the receipt of a complaint that (b) (7)(C) had engaged in funneling money to a TVA employee, John L. (Jack) Symonds, to secure TVA nuclear contracts for HI. This report provides information related to how those payments were made to the TVA employee, (b) (7)(C) involvement with those payments and the pattern of behavior exhibited by (b) (7)(C) when attempting to acquire nuclear contracts. The report also reflects audit findings of overbilling by HI for equipment costs and the rationale provided by HI and TVA for the price difference at two of TVA's nuclear plants. The findings in this report were based on the statements of (b)(7)(D) , several witnesses, the statements of Mr. Symonds, former Brown Ferry Nuclear Plant (BFN) Technical Contract Manager, and documents included as attachments.

On August 3, 2007, Mr. Symonds pled guilty in U.S. federal court to making false financial statements to TVA by not disclosing receiving more than $54,000 from Krohn Enterprises LLC, a company he co-owned with his spouse. Mr. Symonds was paid by HI through another company called U. S. Tool & Die (UST&D). Mr. Symonds knew HI had contracted with TVA in November 2001 to design and construct a dry cask storage system for spent nuclear fuel rods at BFN, and had contracted with UST&D to fabricate some of the construction materials for the TVA BFN dry cask storage system. The money received by Mr. Symonds was used to pay personal expenses of Mr. Symonds and his spouse.

**TVA RESTRICTED INFORMATION**

William R. McCollum, Jr.
Ralph E. Rodgers
Page 2
March 23, 2010

## OVERVIEW

During June 2000, TVA needed above-ground storage containers to store spent
nuclear fuel at Sequoyah Nuclear Plant (SQN).  TVA entered into a contract with HI, for
design and construction services, storage systems, and the necessary ancillary
equipment for the storage containers.  During November 2001, the contract was
supplemented to authorize HI to perform the same services at BFN.  TVA employee
Mr. Symonds was involved in the negotiations for the BFN contract as the BFN
Technical Contract Manager, while being courted by HI with promises of money and
employment.  Mr. Symonds was later paid over $50,000 for his assistance in obtaining
the TVA contract for HI.

## FINDINGS

While TVA was assessing re-racking spent nuclear fuel storage at BFN, the plant
initiated a study to determine if BFN should convert to a dry cask storage system
instead of re-racking its spent nuclear fuel.  Mr. Symonds began advocating strongly
for HI to perform the work at BFN that HI had performed at SQN.  During this time,
(b) (7)(C) agreed to pay Mr. Symonds $50,000. (b) (7)(C) suggested that
Mr. Symonds create a company and took Mr. Symonds to HI's (b) (7)(C)
(b) (7)(C), who provided Mr. Symonds with a contact which would help
Mr. Symonds establish an Limited Liability Company (LLC) in Delaware.

From July 29 to August 2, 2001, Mr. Symonds and his wife went to Philadelphia,
Pennsylvania, on a birthday trip.  The itinerary for the trip was arranged by HI and the
round-trip airline reservation for Mr. Symonds and his wife was made and paid for by
HI.  From Philadelphia, Mr. Symonds and his wife traveled to Atlantic City, New Jersey,
and stayed at the Taj Mahal, the Trump-owned hotel, paid for by HI.  Mr. Symonds and
his wife had dinner with (b) (7)(C) that night.  On July 31,
2001, they returned to Philadelphia where HI had made reservations for the Symonds
at the Rittenhouse Hotel.  (b) (7)(C) arranged for a dinner party for the Symonds at a
fine French restaurant, Le Bec-Fin, and HI paid $2,137.20 for the meal.  Attending
were Mr. Symonds and his wife, (b) (7)(C) and his wife, and three HI executives and
their escorts.  (b) (7)(C) placed Mr. Symonds at the head of the table.

Later in August, 2001, (b) (7)(C) and Mr. Symonds attended a meeting at Fitzpatrick
Power Plant, Oswego, New York, consisting of about 30 people representing various
utilities to discuss lessons learned.  Mr. Symonds was reimbursed a portion of the cost
for this trip by TVA, and travel expenses were also charged to UST&D of which
(b) (7)(C) was the majority owner.  A Confidential Source recalled that (b) (7)(C) and
(b) (7)(C) created a company, FABSCO Inc., and that company controlled UST&D
(see Attachment 1).  While Mr. Symonds was at the meeting, a TVA employee
telephoned Mr. Symonds to tell him the TVA Board decided to proceed with the dry

William R. McCollum, Jr.
Ralph E. Rodgers
Page 3
March 23, 2010

cask storage project for BFN.  During a dinner that night, (b) (7)(C) announced with fanfare to everyone present the decision to award the BFN work to HI, to the celebratory sound of clinking glasses.  During the dinner, Mr. Symonds' wife told (b) (7)(C) her vocation was credentialing doctors, which included conducting physicians' background checks.

On September 13, 2001, Mr. Symonds had a breakfast meeting with (b) (7)(C) at the Marriott Hotel, Huntsville, Alabama.  Previously, (b) (7)(C) had discussed employment for Mr. Symonds with HI.  During this meeting, (b) (7)(C) expressed concern, to avoid appearance problems, that Mr. Symonds not come to work at HI directly from TVA.  Mr. Symonds would manage a construction company that appeared to be a separate entity from HI.  (b) (7)(C) offered Mr. Symonds a vice-president position at HI with a salary of $175,000 per year plus one percent of the business.  (b) (7)(C) suggested January 1, 2002, as the target date for Mr. Symonds to report to work at HI.  Mr. Symonds considered himself a part of HI from that point on, even though he continued to work for TVA.  (b) (7)(C) told Mr. Symonds they could set up a way to pay Mr. Symonds $50,000 by setting up a business through Mr. Symonds' wife for background investigation services.

During November 2001, the HI dry cask contract for SQN was supplemented to authorize HI to perform the same services at BFN.  Mr. Symonds had been involved in the negotiations for the BFN contract as the BFN Technical Contract Manager.

Also in November 2001, Mr. Symonds established Krohn Enterprises, an LLC in Delaware.  On December 13, 2001, a post office box was created for Krohn Enterprises, in Huntsville, Alabama, and the name "Jack Symonds" was included as a person with access to the box.  A bank account was also created in the name of Krohn Enterprises.  Mr. Symonds came up with the name Krohn by using the first two letters of (b) (7)(C) first name, (b) (7) and the last three letters of his own name, (b) (7)(C).

Further, in November 2001, Mr. Symonds and his wife made a house-hunting trip to Philadelphia, Pennsylvania.  The trip was later reimbursed by (b) (7)(C) through UST&D.  During this trip, (b) (7)(C) moved Mr. Symonds' employment date from January to April 2002.

Shortly after the meeting in November, Mr. Symonds and (b) (7)(C) met at a restaurant in Cherry Hill, New Jersey.  (b) (7)(C) said he did not know if they were going to bring Mr. Symonds in to HI as a vice president, and said Mr. Symonds might be worth more to (b) (7)(C) by remaining at BFN during the Unit 1 restart.  (b) (7)(C) then said he would pay Mr. Symonds an additional $100,000.

William R. McCollum, Jr.
Ralph E. Rodgers
Page 4
March 23, 2010

Subsequently, ████████ instructed UST&D to make a payment of $50,000 to an agency that would be billing UST&D for background checks. No investigative services were rendered to UST&D, and none were provided by Krohn Enterprises. Krohn Enterprises submitted two invoices to UST&D (Attachment 2). The first invoice, dated January 15, 2002, totaled $29,212.77 and included the first "retainer" payment of $25,000 and $4,212.77 in travel expenses. The travel expenses invoiced to UST&D were for the travel expenses of Mr. Symonds' meetings with ████████ and HI officials. The second invoice, dated February 5, 2002, was for a "retainer fee," payment of $25,000. UST&D paid Krohn Enterprises a total of $54,212.77. A review was conducted of documents obtained by the Office of the Inspector General (OIG) regarding travel by Mr. Symonds and a copy of the review is attached (Attachment 3).

In approximately January 2002, Mr. Symonds learned from TVA employee ████████ ████████, who replaced Mr. Symonds as the Technical Contract Manager for the HI contract, that ████████ had been offered a job by ████████ Mr. Symonds did not miss the fact that he was now being ignored by ████████ while ████████ was pitching ████████ to work for him. Mr. Symonds prepared a letter (Attachment 4) and sent it to ████████ as a last chance for a position with HI, although it was clear to Mr. Symonds that his job with HI was dead.

## STATEMENTS BY KRISHNA SINGH

On October 12, 2006, Mr. Symonds consented to telephoning ████████ for the purpose of recording the conversation. Mr. Symonds told ████████ the OIG was aware of the money paid to Mr. Symonds by UST&D and was coming to interview Mr. Symonds. Mr. Symonds requested advice from ████████ on how to handle the situation. ████████ response was as follows:

> Well, you know UST&D had hired your wife to do security checks. She got paid for that, right? That was the retainer paid to do the work. She did do retainer work. Why are they auditing your account? There's no, there's nothing that uh, I mean it was a clean transaction, she was in the business of checking out, you know we had some, to my knowledge, UST&D had some problems with thefts and stuff, otherwise it was checks. She paid for, you know they paid for it. But you didn't do any direct business with UST&D, did you? They won't call me because I have nothing to do with it, you know. But to the extent that I pointed to a potential source for UST&D to get the help, they ask me I'll tell them. You know, I'll tell them the straight scoop. Jack you ought to make sure that you tell them that you really have no, the funds you don't know anything about the fact, other than the fact that your wife was in the business of doing consulting services and it was payment retainer for that work, and it's a company that you don't do any business with, and you have not.

**TVA RESTRICTED INFORMATION**

William R. McCollum, Jr.
Ralph E. Rodgers
Page 5
March 23, 2010

A copy of the entire transcription is attached (Attachment 5).

A few minutes after the recording above was made, ███████ was interviewed in his office by
OIG Special Agents.  During that interview ███████ stated essentially the following.

- Sometime between 1999 and 2001, UST&D was having problems with
  employee thefts.  He wasn't sure if it was parts being stolen or other materials,
  but there was a problem. ███████ advised that he mentioned to someone that
  Mr. Symonds did security checks.  He wasn't sure if it was Mr. Symonds, his
  partner or someone associated with Mr. Symonds that helped companies catch
  employees stealing. ███████ may have mentioned the theft problems to
  Mr. Symonds and suggested Mr. Symonds call the plant manager or he may
  have mentioned it to plant personnel to contact Mr. Symonds, he just couldn't
  remember. ███████ thought he may have put Mr. Symonds in touch with
  several other people. ███████ said he could not give the specifics about how
  he knew Mr. Symonds was involved with catching employees stealing at
  factories. ███████ did not know if UST&D used Mr. Symonds or not.

- ███████ recalled Mr. Symonds visited HI on a couple of occasions when
  Mr. Symonds was on a project they were doing at BFN.  If Mr. Symonds came
  to HI, he ███████ would have seen him.  He never requested that HI
  employees entertain Mr. Symonds.  However, he did know that Mr. Symonds
  was friendly with one of HI's engineers who no longer worked for HI.
  ███████ was asked if he provided any entertainment to Mr. Symonds and
  ███████ said he remembered having dinner with Mr. Symonds on one
  occasion.  He does not remember who paid for the meal but he normally
  offered to pay for any meal he had with someone and they normally obliged.
  Sometimes clients would send checks back to him for the cost of their meals.
  He did not recall the specifics about the meal with Mr. Symonds.

- ███████ stated that he would not have offered any money to Mr. Symonds or
  Krohn Enterprises for any reason.  He did not direct anyone to pay any money
  to Mr. Symonds or Krohn Enterprises for any reason.  He did not think that
  Mr. Symonds would solicit money from him.  He said he has a particular air
  about him, and no one would ask a cent from him. ███████ said that he was
  a very ethical person in business dealings. ███████ stated he could not say
  if someone at HI or UST&D paid Mr. Symonds, but he has never been told
  anything or that anyone paid Krohn Enterprises anything. ███████ opined
  that Mr. Symonds was not in a position to award contracts for TVA.

William R. McCollum, Jr.
Ralph E. Rodgers
Page 6
March 23, 2010

**OTHER BAD ACTS BY** [b] (7)(C)

[b] (7)(D) , Exelon Corporation provided documentation relating to an internal investigation concerning an engineer in a position to potentially influence a contract award to HI and whose wife had a business with which HI began doing business under [b] (7)(C) direction. That investigation was instituted upon the receipt of information that HI, a contractor involved in a $20,000,000 project with ComEd, an Exelon company, for dry cask storage products, had switched travel agencies and began using an agency in Northbrook, Illinois, called Cove Travel. That travel agency was allegedly owned by [b] (7)(C) , a Senior Engineer at ComEd Corporate Services, who was involved in administering the project with HI. According to a ComEd Supervising Engineer, in mid-July 1997, while on an audit trip to Japan, a HI Quality Assurance Manager, stated [b] (7)(C) had sent a letter to all HI employees instructing all travel arrangements be made through a travel agency in Northbrook. This letter was followed up six months later by [b] (7)(C) diverting all travel arrangements to [b] (7)(C) ). During the internal investigation [b] (7)(C) was interviewed concerning the matter and stated he had known [b] (7)(C) since late 1989 or early 1990. [b] (7)(C) was sure that [b] (7) (C) made the initial contact with him relative to Cove Travel. She then submitted a proposal which he turned over to one of the two HI personnel who handled travel arrangements for the firm. He advised that [b] (7)(C) had never put pressure on him to use Cove Travel and had never told him he would increase/decrease ComEds business with HI dependent upon the use of Cove Travel. Were this to happen, [b] (7)(C) would "kick him out," stating in his mind, for one thing, [b] (7)(C) had "zero" authority to place business and had no "clout."

[b] (7)(C) **WRITES TO INSPECTOR GENERAL AND CHIEF NUCLEAR OFFICER**

[b] (7)(C) sent a letter addressed to the TVA Inspector General, Richard W. Moore, dated November 17, 2006 (Attachment 6), during the timeframe criminal investigations were ongoing concerning HI, [b] (7)(C) and Mr. Symonds. In that letter [b] (7)(C) stated, "Holtec International categorically asserts that the company has not provided any funds to Mr. Saimonds [sic] in any shape or form, indirectly or directly."

[b] (7)(C) also e-mailed a letter to Karl Singer, then Chief Nuclear Officer and Executive Vice President, dated November 9, 2006 (Attachment 7). In that letter, [b] (7)(C) stated, in part, "… we do not know anything about the gentleman's (Symonds') interactions with UST&D."

**TVA RESTRICTED INFORMATION**

William R. McCollum, Jr.
Ralph E. Rodgers
Page 7
March 23, 2010


## CONTRACT REVIEW

The OIG conducted a review of the TVA contract with HI for the purchase of dry cask storage systems for spent nuclear fuel at SQN and BFN.  The purpose of the review was to assess the reasonableness of the prices TVA paid HI for certain high-dollar equipment items at BFN in comparison with the prices paid for the equipment at SQN. Specifically, the OIG reviewed the prices TVA paid HI for the four largest dollar-value cask system components:  the MPC (multipurpose canister for spent fuel), HI-STORM 100 (long-term storage overpack for the MPC), HI-TRAC 125D (in-plant transfer overpack for the MPC), and the vertical crawler.  TVA had paid $7,198,763 for the equipment at SQN, versus $9,186,120 at BFN, a difference of $1,987,357.

Information obtained in the review (Attachment 8) found HI may have made false statements regarding the equipment prices proposed to TVA, and it appeared TVA relied on that information to approve prices quoted for the BFN equipment. Additionally, the review found that HI had overbilled TVA at least $276,000 for the BFN vertical crawler because it did not comply with the contract's cost-plus pricing provision. The price HI quoted for the BFN crawler misrepresented its compliance with the contract.

It appeared TVA relied on the information provided by HI to justify paying the higher BFN prices rather than attempting to negotiate lower pricing for BFN. Although it is unknown if TVA could have successfully negotiated lower prices for BFN, key economic indicators and reduction in material prices between the time period when HI proposed the SQN and BFN prices indicate TVA had an opportunity to negotiate better prices.  For example, the price of steel had fallen about seven percent during the period between the SQN proposal and the BFN proposal.

In summary, the OIG review found evidence that the higher prices TVA agreed to pay for the BFN MPC, the HI-STORM 100 and the HI-TRAC 125D were unreasonable.  It appears HI may have misled TVA regarding its pricing and TVA did not attempt to negotiate better prices at BFN.


## RECOMMENDATIONS

We recommend TVA place HI on the Supply Chain Clearance List based on the actions of (b) (7)(C)                  .  In addition, if you decide to take other documented action on the basis of this report, we would appreciate your sending a copy of the relevant information to this office for our file.

We would appreciate being informed within 15 days of your determination of what action is appropriate on the basis of our report.  Our investigative files will be made available for review upon request.

William R. McCollum, Jr.
Ralph E. Rodgers
Page 8
March 23, 2010

This report has been designated "TVA Restricted" in accordance with TVA Business Practice 29, Information Security.  Accordingly, it should not be disclosed further without the prior approval of the Inspector General or his designee.  In addition, no redacted version of this report should be distributed without notification to the Inspector General of the redactions that have been made.

Our investigation of this matter is closed.

John E. Brennan
Assistant Inspector General
  (Investigations)
ET 4C-K

(b) (6)

cc:  Terrell M. Burkhart, WT 3A-K
       Maureen H. Dunn, WT 6A-K
       Peyton T. Hairston, Jr., WT 7B-K
       Tom D. Kilgore, WT 7B-K
       Kenneth E. Tilley, WT 3A-K
       OIG File No. 12E-102

PENNSYLVANIA DEPARTMENT OF STATE
CORPORATION BUREAU

Articles of Incorporation-For Profit
(15 Pa.C.S.)

Entity Number

| ☒ Business-stock (§ 1306) | ☐ Management (§ 2703) |
| ☐ Business-nonstock (§ 2102) | ☐ Professional (§ 2903) |
| ☐ Business-statutory close (§ 2303) | ☐ Insurance (§ 3101) |
| ☐ Cooperative (§ 7102) | |

Name
    M. BURR KEIM COMPANY
Address
    2021 Arch Street
City
    Philadelphia, PA  19103

Document will be returned to the name and address you enter to the left.
←

Fee: $100

Filed in the Department of State on   JUL 25 2002

C. Michael _____
Secretary of the Commonwealth

In compliance with the requirements of the applicable provisions (relating to corporations and unincorporated associations), the undersigned, desiring to incorporate a corporation for profit, hereby states that:

1. The name of the corporation (corporate designator required, i.e., "corporation"," incorporated", "limited" "company" or any abbreviation "Professional corporation" or "P.C"):

FABSCO, Inc.

2. The (a) address of this corporation's current registered office in this Commonwealth (post office box, alone, is not acceptable) or (b) name of its commercial registered office provider and the county of venue is:

| (a) Number and Street | City | State | Zip | County |
| | 1800 One Liberty Place | | | |
| c/o White and Williams LLP | Philadelphia | PA | 19103 | Philadelphia |
| Attention: G. P. Biehn, Esq. | | | | |
| (b) Name of Commercial Registered Office Provider | | | | County |

c/o:

3. The corporation is incorporated under the provisions of the Business Corporation Law of 1988.

4. The aggregate number of shares authorized: 10,000 shares common

PA-201 - 10/01/2001 C T System Online

TVA RESTRICTED INFORMATION

Attachment 1
Page 2 of 11

$\boxed{200206\ 6\text{-}\ 800}$

DSCB:15-1306,2102/2302/2702/2903/3101/7102A-2

---

5. The name and address, including number and street, if any, of each incorporator *(all incorporators must sign below):*

| Name | Address |
|---|---|
| Susan J. Kadin | White and Williams LLP |
|  | 1800 One Liberty Place |
|  | Philadelphia, PA 19103 |

---

6. The specified effective date, if any: Upon filing
                    month/day/year  hour, if any

---

7. Additional provisions of the articles, if any, attach an 8½ by 11 sheet.

---

8. *Statutory close corporation only.* Neither the corporation nor any shareholder shall make an offering of any of its shares of any class that would constitute a "public offering" within the meaning of the Securities Act of 1933 (15 U.S.C. 77a et seq.)

---

9. *Cooperative corporations only. Complete and strike out inapplicable term:*

The common bond of membership among its members/shareholders is:

---

IN TESTIMONY WHEREOF, the incorporator(s)
has/have signed these Articles of Incorporation to be
signed by a duly authorized officer thereof this

.25th. day of  July           .2002

Susan J. Kadin, Incorporator        Signature

                    Signature

PAGE   02/01/2012 C.T. System Online

2002066- 801

## ARTICLES OF INCORPORATION

### FABSCO, INC.

#### Additional Provisions

7(a).   Shareholders shall not have cumulative voting rights in the election of directors.

7(b).   The term of the corporation is perpetual.

Doc#: 105395 v5

**TVA RESTRICTED INFORMATION**

FROM WHITE & WILLIAMS   2002071-971

## PENNSYLVANIA DEPARTMENT OF STATE
### CORPORATION BUREAU

### Articles/Certificate of Merger
(15 Pa.C.S.)

| | | |
|---|---|---|
| Entry Number | [X] Domestic Business Corporation (§ 1926) | |
| 811235 | [ ] Domestic Nonprofit Corporation (§ 5926) | |
| | [ ] Limited Partnership (§ 8547) | |

Name

Address

**CT CORP-COUNTER**

Document will be returned to the name and address you enter to the left.

Fee: $108 plus $28 additional for each Party in addition to two

Filed in the Department of State on AUG 16 2002

C. Michael Stewart

Secretary of the Commonwealth

In compliance with the requirements of the applicable provisions (relating to articles of merger or consolidation), the undersigned, desiring to effect a merger, hereby state that:

1. The name of the corporation/limited partnership surviving the merger is
   U. S. Tool & Die, Inc.

2. Check and complete one of the following:
   [X] The surviving corporation/limited partnership is a domestic business/nonprofit corporation/limited partnership and the (a) address of its current registered office in this Commonwealth or (b) name of its commercial registered office provider and the county of venue is (the Department is hereby authorized to correct the following information to conform to the records of the Department)

   | (a) Number and Street | City | State | Zip | County |
   |---|---|---|---|---|
   | Keystone Commons, 200 Braddock Ave | Turtle Creek | PA | 15145 | Allegheny |

   | (b) Name of Commercial Registered Office Provider | | | | County |
   |---|---|---|---|---|
   | c/o | | | | |

   [ ] The surviving corporation/limited partnership is a qualified foreign business/nonprofit corporation/limited partnership, incorporated/formed under the laws of _____ and the (a) address of its current registered office in this Commonwealth or (b) name of its commercial registered office provider and the county of venue is (the Department is hereby authorized to correct the following information to conform to the records of the Department)

   | (a) Number and Street | City | State | Zip | County |
   |---|---|---|---|---|
   | | | | | |

   | (b) Name of Commercial Registered Office Provider | | | | County |
   |---|---|---|---|---|
   | c/o | | | | |

   [ ] The surviving corporation/limited partnership is a qualified foreign business/nonprofit corporation/limited partnership, incorporated/formed under the laws of _____ and the address of its principal office under the laws of such domiciliary jurisdiction is

   | Number and Street | City | State | Zip |
   |---|---|---|---|
   | | | | |

Attachment 1
Page 5 of 11

2002071- 972

3. The name and the address of the registered office in this Commonwealth or name of its commercial registered office provider and the county of venue of each other domestic business/nonprofit corporation/limited partnership and qualified foreign business/nonprofit corporation/limited partnership which is a party to the plan of merger are as follows

| Name | Registered Office Address | Commercial Registered Office Provider | County |
|------|---------------------------|----------------------------------------|--------|
| FABSCO, INC | 1900 ONE LIBERTY PLACE, PHILADELPHIA, PA 19103 | | PHILADELPHIA |

4. Check, and if appropriate complete, one of the following

[X] The plan of merger shall be effective upon filing these Articles/Certificate of Merger in the Department of State

[ ] The plan of merger shall be effective on _____ At _____
Date          Hour

5. The manner in which the plan of merger was adopted by each domestic corporation/limited partnership is as follows

| Name | Manner of Adoption |
|------|--------------------|
| FABSCO, Inc | Board of Directors pursuant to PA BCL1924(b)(1)(ii) & 1924 (b)(3) |

6. Strike out this paragraph if no foreign corporation/limited partnership is a party to the merger. The plan was authorized, adopted or approved, as the case may be, by the foreign business/nonprofit corporation/limited partnership (or each of the foreign business/nonprofit corporation/limited partnerships) party to the plan in accordance with the laws of the jurisdiction in which it is incorporated/organized.

7. Check and if appropriate complete, one of the following

[X] The plan of merger is set forth in full in Exhibit A attached hereto and made a part hereof

[ ] Pursuant to 15 Pa C S § 1901/§ 8547(b) (relating to omission of certain provisions from filed plans) the provisions of any, of the plan of merger that amend or constitute the operative provisions of the Articles of Incorporation/Certificate of Limited Partnership of the surviving corporation/limited partnership as in effect subsequent to the effective date of the plan are set forth in full in Exhibit A attached hereto and made a part hereof The full text of the plan of merger is on file at the principal place of business of the surviving corporation/limited partnership the address of which is

| Number and street | City | State | Zip | County |
|-------------------|------|-------|-----|--------|
| | | | | |

DSCB 15-1926/6026 8547-3

Atachment 1
Page 6 of 11

200207 1· 973

IN TESTIMONY WHEREOF, the undersigned
corporation/limited partnership has caused these
Articles/Certificate of Merger to be signed by a duly
authorized officer thereof this

_14ᵗʰ_ day of _August_

2002

FABSCO, Inc

Name of Corporation/Limited Partnership

Signature

David S. Ferman, President

Title

Name of Corporation/Limited Partnership

Signature

Title

FROM WHITE & WILLIAMS LLP

200207 1- 974

## Exhibit A

### Plan of Merger

This Plan of Merger ("Plan") between FABSCO, Inc., a Pennsylvania corporation ("Parent"), and U.S. Tool & Die, Inc., a Pennsylvania corporation ("Subsidiary") shall be adopted by Parent in the manner and become effective as of the time provided below.

1.     Background.  Parent is record and beneficial owner of 82.47% of the issued and outstanding capital stock of Subsidiary ("Subsidiary Common Stock"). The remaining shares of the Subsidiary Common Stock are owned and held of record by those shareholders listed in the Subsidiary's corporate records as of the Plan Adoption Date (as such term is defined in Section 2 of this Plan). The Board of Directors of Parent has determined that is desirable and in the best interests of Parent and Subsidiary that Parent be merged with and into the Subsidiary on the terms and conditions set forth in this Plan and in accordance with the applicable provisions of the Pennsylvania Business Corporation Law of 1988, as amended (the "PA BCL").

2.     Approval.  This Plan shall become adopted ("Plan Adoption Date") upon its approval by the Board of Directors of the Parent in accordance with Sections 1922(c), 1924(b)(1)(ii), and 1924(b)(3) of the PA BCL.

3     Time and Effect of Merger.

(a)     *Effective Time.*  The Merger shall become effective at the close of business on the date upon which appropriate Articles of Merger (to which this Plan will be attached and incorporated therein) are filed with the Department of State of the Commonwealth of Pennsylvania ("Merger Effective Time").

(b)     *Effects of Merger.*  At the Merger Effective Time, Parent shall merge with and into Subsidiary, the separate existence of Parent shall cease, and Subsidiary shall be the surviving corporation (the "Surviving Corporation"), all in accordance with this Plan and the applicable provisions of the PA BCL (the "Merger"). At the Merger Effective Time and as a result of the Merger, the Surviving Corporation shall continue to exist as a domestic business corporation under the laws of the Commonwealth of Pennsylvania with all of the rights and obligations of such surviving domestic business corporation as are provided by Section 1929 and the other applicable provisions of the PA BCL. Without limiting the generality of the foregoing, as of the Merger Effective Time, all of the property (real, personal and mixed), rights, powers, privileges, immunities, licenses, permits and franchises (both of a

private and public nature), and restrictions, duties, and obligations of the Parent and Subsidiary shall be taken and be deemed to be transferred to and vested or continued to be vested, as the case may be, in the Surviving Corporation, without further act, agreement, approval or deed.

4.      Articles of Incorporation; Bylaws.  The Articles of Incorporation and Bylaws of the Subsidiary as in effect prior to the Merger Effective Time shall remain the same and continue unchanged as, respectively, the Articles of Incorporation and Bylaws of the Surviving Corporation on and after the Merger Effective Time until changed in accordance with their respective terms and the applicable provisions of the PA BCL.

5.      Directors and Officers.  The Officers of Subsidiary prior to the Merger Effective Time shall, as of the Merger Effective Time, be and remain, respectively, the Officers of the Surviving Corporation until their respective successors are duly elected and qualified under the Bylaws of the Surviving Corporation then in effect, or until their earlier death or until their resignation or removal in accordance with such Bylaws.  As of the Effective Time, the Directors of the Surviving Corporation shall be David S. Forman, Robert L. Moscaritini and Christopher P. Strock who will serve as Directors of the Surviving Corporation until their respective successors are duly elected and qualified under the Bylaws of the Surviving Corporation then in effect, or until their earlier death or resignation or removal in accordance with such Bylaws.

6.      Conversion of Shares.

(a)      Conversion of Shares of Subsidiary.  Subject to the provisions of Sections 7 and 8 of this Plan, except for Dissenting Shares (as such term is defined in Section 10 of this Plan), which at the Merger Effective Time shall be converted into the right to receive the consideration determined in accordance with Section 10 of this Plan and the applicable provisions of the PA BCL, each share of Subsidiary Common Stock shall, at the Merger Effective Time, without further action and by virtue of the Merger, be converted into the right to receive cash consideration in the amount of $ .75 for each share of Subsidiary Common Stock, payable in accordance with Sections 7 and 8 of this Plan, and shall no longer be outstanding and shall be deemed to be automatically cancelled and cease to exist.

(b)      Conversion of Shares of Parent.  Subject to the provisions of Section 8 of this Plan, each share of capital stock of Parent ("Parent Shares") shall, at the Merger Effective Time, without further action and by virtue of the Merger, be converted into one (1) share of capital stock of the Surviving Corporation, and shall no longer be outstanding and shall be deemed to be automatically cancelled and cease to exist.

7.      Withholding Rights.  The Surviving Corporation shall be entitled to deduct and withhold from the consideration otherwise payable under Section 6 or 10 of this Plan, as the case may be, such amounts, if any, as it is required to deduct, withhold, and remit with

-2-

TVA RESTRICTED INFORMATION

200207 1- 976

respect to the making of such payment under any provision of federal, state or local tax law (a "Withholding"). Any such Withholding shall be treated for all purposes (including without limitation this Plan and the Merger) as having been paid to the Record Shareholder (as such term is defined in Section 8) in respect of which the Surviving Corporation made such Withholding and, notwithstanding anything contained to the contrary in this Plan, such Record Shareholder shall only be entitled to receive from the Surviving Corporation the consideration payable pursuant to this Plan and/or the Dissenters' Rights Provisions (as such term is defined in Section 10 of this Plan), less any Withholding, which shall be payable on such Record Shareholder's account to the applicable federal, state or local taxing authority in accordance with applicable federal, state or local tax law ("Net Merger Consideration").

8    Notice; Surrender and Payment; Rights in Subsidiary Common Stock; Etc.

(a)    *Merger Notice.*  As soon as practicable following the Merger Effective Time, the Surviving Corporation shall mail or cause to be mailed to each record holder or record owner, as the case may be (individually, a "Record Shareholder" and collectively the "Record Shareholders") of the shares of Subsidiary Common Stock on the Plan Adoption Date notices ("Merger Notice") advising them of and enclosing, as applicable: (i) the effectiveness of the Merger, (ii) a copy of this Plan; (iii) a form letter of transmittal and instructions regarding the surrender of their certificates formerly representing shares of Subsidiary Common Stock ("Subsidiary Certificates"), or in lieu thereof, such evidence of lost, stolen or destroyed certificate(s) and such surety bonds or other security as the Surviving Corporation may, in its discretion, require ("Required Documentation"), in exchange for the applicable Net Merger Consideration, and (iv) the notices, information and other materials required to be provided to the Record Shareholders under Section 1575 of the PA BCL.

(b)    *Surrender of Subsidiary Certificates; Payment of Consideration.*  After the Merger Effective Time, upon surrender of their Subsidiary Certificates, or in lieu thereof, the Required Documentation, to the Surviving Corporation with a properly completed and executed letter of transmittal (substantially in the form included in the Merger Notice) with respect to such certificates, a Record Shareholder will be entitled to receive the applicable Net Merger Consideration. Such consideration shall be delivered by the Surviving Corporation as promptly as practicable after such surrender. Except as otherwise expressly provided in Section 10 of this Plan, without the written consent of a Record Shareholder and such other documentation and other items as the Surviving Corporation in its discretion may require (a "Permitted Substitution"), no person other than a Record Shareholder shall be entitled to receive any consideration whatsoever from the Surviving Corporation as a result of the Merger. In the event of a Permitted Substitution, except in respect of the availability of Dissenters' Rights (as such term is defined in Section 10)), which shall be determined in accordance with Section 10 of this Plan, such person shall be considered a Record Shareholder for purposes of this Plan and the Record Shareholder for which a Permitted Substitution was

-2-

TVA RESTRICTED INFORMATION

200207 1· 977

made shall thereafter have no right to receive any consideration from the Surviving Corporation as a result of the Merger.

(c) *Rights in Subsidiary Common Stock Following Merger*. As of the Merger Effective Time, (i) the Record Shareholders, all other holders of Subsidiary Certificates, and all beneficial but not record owners of Subsidiary Common Stock prior to the Merger Effective Time, if any, shall cease to have rights with respect to such previously outstanding stock, provided, however, that the Record Shareholders only shall have the right to either exchange his, her or its Subsidiary Certificates or Required Documentation, as the case may be, for the Net Merger Consideration to which such Record Shareholder may be entitled pursuant to Sections 6 and 7 of this Plan or elect their Dissenters' Rights in accordance with the Dissenters' Rights Provisions (as such terms are defined in Section 10 of this Plan); and (ii) the Subsidiary Certificates held by Record Shareholders shall be deemed to evidence only ownership of either such Net Merger Consideration or Dissenters' Rights in respect of such Subsidiary Common Stock, if so elected in accordance with the Dissenters' Rights Provisions In no event shall the Surviving Corporation be obligated to deliver Net Merger Consideration set forth in Sections 6 and 7 or determined pursuant to Section 7 and the Dissenters' Rights Provisions to a Record Shareholder unless and until such Record Shareholder surrenders his, her or its Subsidiary Certificates or furnishes the Required Documentation, as the case may be.

(d) *Surrender of Parent Shares Certificates; Issuance of Surviving Corporation Stock*. Upon receipt by the Surviving Corporation of the certificates representing the Parent Shares or in lieu thereof Required Documentation, as the case may be, together with a properly completed and executed letter of transmittal (in the form acceptable to the Surviving Corporation) with respect to such certificates, the Surviving Corporation will issue to the Parent's shareholders certificates representing the same number of shares of capital stock of the Surviving Corporation as had been held by them in the Parent immediately prior to the Merger Effective Time

9. *Termination of Plan*. This Plan may be terminated and the Merger abandoned by action of the Board of Directors of Parent at any time before the Merger Effective Time.

10. *Dissenters' Rights*. Each (i) Record Shareholder or (ii) subject to compliance with the provisions of Section 1573 of the PA BCL, beneficial owner of Subsidiary Common Stock that is not a Record Shareholder (either, a "Dissenter"), as the case may be, shall be entitled to exercise dissenters' rights ("Dissenters' Rights") with respect to his, her or its shares of Subsidiary Common Stock ("Dissenting Shares") as a result of the Merger, as provided in Sections 1930(a) and 1571 and the other applicable sections of the PA BCL ("Dissenters' Rights Provisions"). Notwithstanding the foregoing, a Dissenter shall forfeit his, her or its Dissenters' Rights, unless such Dissenter makes a demand pursuant to the provisions of Section 1575 of the PA BCL at the time and place specified in the Merger Notice with respect to such shares (a "Perfected Dissenter"). A Perfected Dissenter will be entitled,

-2-

subject to compliance with Section 8 of this Plan, to the fair value (less any Withholdings) for his, her or its Dissenting Shares, which fair value will be determined in accordance with Sections 1578 and/or 1579 of the PA BCL, as applicable, and will have such other rights and be subject to such obligations as are accorded to or imposed upon him, her or it pursuant to the Dissenters' Rights Provisions; provided, however, that if a Perfected Dissenter shall subsequently deliver a written withdrawal of his, her or its demand for appraisal of such shares (with the written approval of the Surviving Corporation), then such person shall also forfeit his, her or its Dissenters' Rights. In the event that a Dissenter forfeits his, her or its Dissenters' Rights, then such shares shall thereupon be deemed to have been converted into and to have become exchangeable for, as of the Merger Effective Time, subject to the provisions of Section 8 of this Plan, the right to receive his, her or its Net Merger Consideration provided in Sections 6(a) and 7 of this Plan without any interest or other additional sums payable thereon.

11.   Amendment. This Plan may be amended in any manner at any time before the Merger Effective Time by action of the Board of Directors of Parent, subject to compliance with Section 1922(b) of the PA BCL.

The Parent has adopted this Plan as of August 7, 2002.

-5-

**TVA RESTRICTED INFORMATION**

Attachment 2
Page 1 of 2

**KROHN ENTERPRISES**
**PO BOX 5324**
**HUNTSVILLE, AL**
**35814-5324**
**(256) 655-5399**

# INVOICE

DATE:  January 15, 2002
INVOICE # 0001
RE:  P.O. 01-12145

**Bill To:**
US Tool & Die
200 Braddock Avenue
Turtle Creek, PA  15145

**For:**
Retainer (1/2)
Expenses to Date

| DESCRIPTION | | | AMOUNT |
|---|---|---|---|
| Retainer (½ 1st payment) | | | 25,000.00 |
| Airline Tickets | | | 2,473.50 |
| Hotel | | | 1113.83 |
| Car Rental | | | 413.28 |
| Fuel | | | 39.00 |
| Meals | | | 104.16 |
| Tolls | | | 21.00 |
| Parking | | | 48.00 |
| | | **TOTAL** | $29,212.77 |

Make all checks payable to **Krohn Enterprises**
Payable upon receipt.

**TVA RESTRICTED INFORMATION**

Attachment 2
Page 2 of 2

**KROHN ENTERPRISES**
**PO BOX 5324**
**HUNTSVILLE, AL**
**35814-5324**
**(256) 655-5399/5400**

**INVOIC**

DATE: February 15, 2002
INVOICE # 0002
RE:  P.O. 01-12145

Bill To:
US Tool & Die
200 Braddock Avenue
Turtle Creek, PA  15145

For:
Retainer (1/2)

| DESCRIPTION | | | AMOUNT |
|---|---|---|---|
| Retainer (½ 2nd payment) | | | 25,000.00 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | TOTAL | $25,000.00 |

Make all checks payable to **Krohn Enterprises**
Payable upon receipt.

Attachment 3
Page 1 of 4

**Jack Symonds Travel Analysis**
**Case 12E-100**

The following investigation was conducted by Intelligence Analyst (b) (7)(C) on August 10, 2006, in Knoxville, TN.

**Jul 29-Aug 2, 2001**
During the period of 7/29/01 – 8/2/01, Symonds and (b) (7)(C) flew to Philadelphia, PA not on duty status. The hotel is suspected to have been paid for by Holtec. TVA was direct-billed for the rental car because Symonds used his government travel card for the rental. TVA was not reimbursed by Symonds. (Title 18, Sec 287).

| July 29 – August 2, 2001 | | Company Paying Symonds' Travel Expenses | | |
|---|---|---|---|---|
| Flight Location: Philadelphia, PA | Expense Category | TVA | US Tool & Die | Holtec |
| Hotel Locations: | Flight | - | - | Unknown |
| Atlantic City, NY | Hotel | - | - | $1,176.70 |
| Philadelphia, PA | Rental Car | $244.75 | - | Unknown |
| | Meals | - | - | Unknown |
| | Gas | - | - | Unknown |
| **On Leave from TVA** | Miscellaneous | - | - | Unknown |
| | Total | $244.75 | $0 | $1,176.70 |

**Aug 20 - 26, 2001**
During the period of 8/20/01 – 8/26/01, Symonds and (b) (7)(C) flew to Syracuse, NY. Symonds' status was on-duty and TVA paid his travel expenses. Subsequently, US Tool & Die also paid for some of his travel expenses through Krohn (Title 18, Sec 209 and 1001).

| August 20 – 26, 2001 | | Company Paying Symonds' Travel Expenses | | |
|---|---|---|---|---|
| Flight Location: Syracuse, NY | Expense Category | TVA | US Tool & Die | Holtec |
| Hotel Locations: | Flight | $349.00 | $349.00 | - |
| Syracuse, NY | Hotel | $374.64 | $374.64 | - |
| New York, NY | Rental Car | - | - | - |
| | Meals | $34.32 | - | - |
| **Not On Leave from TVA** | Gas | - | - | - |
| | Miscellaneous | $186.20 | - | - |
| | Total | $944.16 | $723.64 | $0 |

Attachment 3
Page 2 of 4

**Jack Symonds Travel Analysis**
**Case 12E-100**

**Sep 6 - 7, 2001**
During the period of 9/6/01 – 9/7/01, Symonds flew to Philadelphia, PA
on duty status and TVA paid his travel expenses. Subsequently, US Tool & Die
also paid for some of his travel expenses through Krohn Enterprises
(Title 18, Sec 209).

| September 6 – 7, 2001 | | Company Paying Symonds' Travel Expenses | | |
|---|---|---|---|---|
| Flight Location: Philadelphia, PA | Expense Category | TVA | US Tool & Die | Holtec |
| Hotel Location: Mount Laurel, NJ | Flight | $232.50 | - | - |
| | Hotel | $138.71 | $138.85 | - |
| | Rental Car | $84.55 | $84.55 | - |
| | Meals | $37.48 | - | - |
| **Not On Leave from TVA** | Gas | - | - | - |
| | Miscellaneous | $74.58 | - | - |
| | Total | $567.82 | $223.40 | $0 |

**Sep 23 - 30, 2001**
During the period of 9/23/01 – 9/30/01, Symonds and (b) (7)(C) flew to Allentown, PA,
on leave status. TVA was direct-billed for Symonds' rental car because Symonds
used his government travel card for the rental (Title 18, Sec 287).

| September 23 – 30, 2001 | | Company Paying Symonds' Travel Expenses | | |
|---|---|---|---|---|
| Flight Location: Allentown, PA | Expense Category | TVA | US Tool & Die | Holtec |
| Hotel Location: Unknown | Flight | - | $266.00 | - |
| | Hotel | - | - | - |
| | Rental Car | $484.44 | - | - |
| | Meals | - | - | - |
| **On Leave from TVA** | Gas | - | $21.80 | - |
| | Miscellaneous | - | - | - |
| | Total | $484.44 | $287.80 | $0 |

Attachment 3
Page 3 of 4

**Jack Symonds Travel Analysis**
**Case 12E-100**

**Oct 7 - 8, 2001**

During the period of 10/7/01 – 10/8/01, Symonds flew to Philadelphia, PA during
a holiday period.  The cost of the flight was direct billed to TVA because Symonds
used his government travel card to purchase the ticket, and US Tool & Die,
through Krohn, also paid the cost (Title 18, Sec 287 and 1001).

| October 7 – 8, 2001 | | Company Paying Symonds' Travel Expenses | | |
|---|---|---|---|---|
| Flight Location: Philadelphia, PA | Expense Category | TVA | US Tool & Die | Holtec |
| Hotel Location: Mount Laurel, NJ | Flight | $264.50 | $264.50 | - |
| | Hotel | - | $144.56 | - |
| | Rental Car | - | $50.09 | - |
| | Meals | - | - | - |
| Federal Holiday | Gas | - | - | - |
| | Miscellaneous | - | - | - |
| | Total | $264.50 | $459.15 | $0 |

**Nov 9-12, 2001**

During the period of 11/9/01 – 11/12/01, Symonds and two friends flew to
Baltimore, MD. Symonds rented a car and drove to NJ over a weekend/holiday.
Symonds submitted a travel voucher to TVA for reimbursement of
expenses, and he also was reimbursed for his airline ticket, hotel, and the rental
car by US Tool & Die through Krohn (Title 18, Sec 209 and/or 287).

| November 9 – 12, 2001 | | Company Paying Symonds' Travel Expenses | | |
|---|---|---|---|---|
| Flight Location: Baltimore, MD | Expense Category | TVA | US Tool & Die | Holtec |
| Hotel Location: Mount Laurel, NJ | Flight | $177.50 | $177.50 | - |
| | Hotel | $314.82 | $314.82 | - |
| | Rental Car | $136.91 | $136.91 | - |
| | Meals | $62.04 | $14.78 | - |
| Weekend/Federal Holiday | Gas | - | $17.20 | - |
| | Miscellaneous | $43.52 | $27.00 | - |
| | Total | $734.79 | $688.21 | $0 |

Attachment 3
Page 4 of 4

**Jack Symonds Travel Analysis**
**Case 12E-100**

**Dec 6-7, 2001**
During the period of 12/6/01 – 12/7/01, Symonds flew to Philadelphia, PA on duty status, rented a car and traveled to NJ. Symonds submitted a voucher to TVA for reimbursement of expenses and also was reimbursed by US Tool & Die through Krohn (Title 18, Sec 209 and 1001).

| December 6 – 7, 2001 | | Company Paying Symonds' Travel Expenses | | |
|---|---|---|---|---|
| Flight Location: Cherry Hill, NJ | Expense Category | TVA | US Tool & Die | Holtec |
| Hotel Location: Mount Laurel, NJ | Flight | $546.50 | $546.50 | - |
| | Hotel | $140.96 | $140.96 | - |
| | Rental Car | $102.13 | $102.13 | - |
| | Meals | $21.80 | $21.74 | - |
| Not On Leave from TVA | Gas | - | - | - |
| | Miscellaneous | $26.52 | - | - |
| | Total | $837.91 | $811.33 | $0 |

**TVA RESTRICTED INFORMATION**

Attachment 4
Page 1 of 2

**KROHN ENTERPRISES**
**PO BOX 5324**
**HUNTSVILLE, AL**
**35814-5324**
**(256) 655-5400**

(b) (6)                                               April 1, 2002

Holtec International
Holtec Center
555 Lincoln Drive West
Marlton, NJ  08053

Dear (b) (6)

It is becoming more and more difficult for you and I to engage in business conversations,
although, through no fault of our own. I am also finding that I too am experiencing some
of the paranoid feelings that you have previously expressed concern about. I have
determined that the only way to truly communicate with you without fear of some kind of
electronic eavesdropping or wiretapping or some other kind of industrial spying
technique is to simply revert to a simpler time when writing a letter was the most
effective way of communicating. I think that by exercising this medium we can eliminate
the anxiety of worrying about what some other people might say or do about the
perceptions.

Anyway, I wanted to let you know that the $50K we discussed back in September that
was to be paid for activities through the end of the year 2001 has been satisfied. Now
let's talk about the $100K that you said that you would pay me in 2002 to stay with TVA.
I had originally sent you a proposal that we break that up into quarters which would be
$25K in April, $25K in August, $25K in October and $25K in December. You did not
respond to that proposal except to say that you wanted me to perform the original deal
with Bob. Now that the original deal is satisfied and we are ¼ of the way through 2002, I
think we should address how we are going to bill for the remaining $100K.

Krohn Inc. is alive and well and could very well prove to be the proper conduit for this
transaction. (b) (6) is still the CEO and all business transactions are done through
her. If you want, she can send you an RFQ on Krohn Inc. letterhead explaining the
billing for services rendered. You think about it and let me know how you want to
handle the evolution.

I think that now that the ice has been broken with TVA on a couple of subjects, i.e.,
Engineering analysis activities with (b) (6) and Feedwater Heater issues with
(b) (6) you should probably offer an unsolicited proposal to perform these kinds of
activities. You should address the correspondence to (b) (6) and copy (b) (6)

(b) (6) The only thing is, they might say "come on down and give us a presentation of what you think you can offer". We should be out of the outage by the 10th of April. The bad thing is we are going to do a mid-cycle outage on U2 for 2 identified fuel leakers the last week in April. It will only last a week (we hope). Then the board meets on May 16th to determine the fate of U1. So, if you lay this all out, it looks to me like your best chance at an audience with the decision makers between now and then would be the week of April 15th or the week of May 6th. Plan accordingly.

How is the construction company business search going? Have you told (b) (6) (b) (6) not to talk to me? (I thought you may have told them to pretend I didn't exist for a while until some time had passed). I keep trying to get a hold of them and I am not getting any response.

Let's stay in touch, so that we can eliminate any misunderstandings or any miscommunications that we promised each other we would avoid at all cost.

Talk to you later my friend,

TVA RESTRICTED INFORMATION

Attachment 5
Page 1 of 12

(b) (7)(D)



**TVA RESTRICTED INFORMATION**

Attachment 5
Page 2 of 12



(b) (7)(D)

Atachment 5
Page 3 of 12



Attachment 5
Page 4 of 12



(b) (7)(D)

Attachment 5
Page 5 of 12



(b) (7)(D)

**TVA RESTRICTED INFORMATION**

Attachment 5
Page 6 of 12



Attachment 5
Page 7 of 12



Attachment 5
Page 8 of 12



(b) (7)(D)

Attachment 5
Page 9 of 12



TVA RESTRICTED INFORMATION

Attachment 5
Page 10 of 12



(b) (7)(D)

Attachment 5
Page 11 of 12



(b) (7)(D)

Atttachment 5
Page 12 of 12

(b) (7)(D)



**TVA RESTRICTED INFORMATION**

Attachment 6
Page 1 of 2



**TVA RESTRICTED INFORMATION**

Attachment 6
Pag 2 of 2



Attachment 7
Page 1 of 3



Atttachment 7
Page 2 of 3



**TVA RESTRICTED INFORMATION**

Atttachment 7
Page 3 of 3



Attachment 8
Page 1 of 4

July 30, 2007

Charles A. Kandt, ET 4C-K

SPECIAL PROJECT 2007-11160 – HOLTEC INTERNATIONAL CONTRACT NO. 99999906 – REASONABLENESS OF PRICES TVA PAID FOR CERTAIN DRY CASK STORAGE SYSTEMS COMPONENTS AT BROWNS FERRY NUCLEAR PLANT

As requested by OIG Investigative Operations, we initiated an audit of Contract No. 99999906 that TVA has with Holtec International (Holtec) for the purchase of dry cask storage systems for spent nuclear fuel at Sequoyah Nuclear Plant (SQN) and Browns Ferry Nuclear Plant (BFN). The purpose of our review was to assess the reasonableness of the prices TVA paid Holtec for certain high dollar equipment items at BFN in comparison with the prices paid for the equipment at SQN. Specifically, as summarized in the following table, we reviewed the prices TVA paid Holtec for the four largest dollar-value cask system components: (1) the MPC (multipurpose canister for spent fuel); (2) HI-STORM 100 (long-term storage overpack for the MPC); (3) HI-TRAC 125D (in-plant transfer overpack for the MPC); and (4) the vertical crawler.

| Summary of Price Differences for Major Components of Dry Cask Storage Systems | | | |
|---|---|---|---|
| Description | SQN Price | BFN Price | Difference |
| MPC | | | |
| HI-STORM 100 | | | |
| HI-TRAC 125D | | | |
| Vertical Crawler | | | |
| Total | | | |



Table 1

As discussed in detail below, information obtained in our audit found Holtec may have made false statements regarding the equipment prices proposed to TVA, and it appeared TVA relied on that information to approve prices quoted for the BFN equipment. Additionally, we found that Holtec had overbilled TVA at least $276,000 for the BFN vertical crawler because it did not comply with the contract's cost-plus pricing provision. In our opinion, the price Holtec quoted for the BFN crawler misrepresented its compliance with the contract.

CONTRACT BACKGROUND

On June 30, 2000, TVA entered into Contract No. 99999906 with Holtec to provide equipment and engineering services for a dry cask system to store SQN spent nuclear fuel.[1] On November 8, 2001, the contract was supplemented to include a similar dry cask system for BFN. As of June 20, 2007, the contract had been supplemented 37 times, and TVA had paid Holtec $31.2 million against the contract payment ceiling of $54 million. The contract term is currently set to expire on June 30, 2008.

---

[1] The original Contract No. P00NNQ-258310 was changed to No. 99999906 in July 2001 for conversion to the PassPort supply chain software.

TVA RESTRICTED INFORMATION

Attachment 8
Page 2 of 4

Charles A. Kandt
Page 2
July 30, 2007

The contract included fixed prices for most of the components of the cask system and for defined scopes of engineering tasks to address safety aspects of the cask system unique to the two plant sites.  The contract also included cost-plus pricing for optional items including (1) construction of a storage pad for the casks at the plant site and (2) a vertical crawler heavy lifting device to move the casks from the plant to the on-site storage pad.

The OIG is investigating certain issues regarding the pricing TVA agreed to under the contract with Holtec.  To support the investigation, an audit (Audit 2007-028C) of the contract was initiated to assess the reasonableness of the prices TVA paid Holtec for the four highest dollar cask system components as summarized in Table 1.  To perform our review, we:

- Reviewed the contract and related supplements, correspondence, e-mails, and payment records obtained from TVA's files.

- Visited the SQN and BFN sites and interviewed the dry cask spent nuclear fuel project managers and other key personnel to obtain an understanding about the products purchased.

- Obtained copies of TVA's documentation of products received; Holtec's documentation packages for the MPC, HI-STORM 100, and HI-TRAC 125D units as required by the Nuclear Regulatory Commission for these safety-related items; and Holtec's specification document for each crawler, to more clearly define the products purchased.

- Visited Holtec's offices and reviewed cost information to obtain an understanding about Holtec's costs for the products delivered.

- Visited Lift System's (manufacturer of the vertical crawlers) offices and reviewed documentation of sales and related cost data for vertical crawlers sold to Holtec.

AUDIT FINDINGS AND CONCLUSIONS

Information obtained in our audit found Holtec may have made false statements regarding the equipment prices proposed to TVA, and it appeared TVA relied on that information to approve prices quoted for the BFN equipment.  Additionally, we found that Holtec had overbilled TVA at least $276,000 for the BFN vertical crawler because it did not comply with the contract's cost-plus pricing provision.  In our opinion, the price Holtec quoted for the BFN crawler misrepresented its compliance with the contract.

MPC, HI-STORM 100, and HI-TRAC 125D

Holtec's proposal (dated September 12, 2001) to add the BFN scope of work included significant price increases for the MPC, HI-STORM 100, and HI-TRAC 125D components in comparison to the prices TVA had agreed to pay for similar equipment at SQN.  Our review of TVA and Holtec files found Holtec may have made false statements to TVA when it explained why the prices it had quoted for certain BFN components were higher than the SQN prices.  Specifically, in a draft letter submitted to TVA, Holtec informed that:

- The HI-STORM 100 for BFN was a significantly improved model in comparison to the model proposed for use at SQN in that (1) it had a reduced height for transport through

Attachment 8
Page 3 of 4

Charles A. Kandt
Page 3
July 30, 2007

the plant's external door, and (2) it reduced radiation exposure by about one rem per cask.

- The (lower) SQN price for the HI-TRAC 125D was the result of an arithmetic error during quoting.

Each of these statements appears to be false or at least misleading because:

(1) BFN's external door has an additional 4 feet of vertical clearance in comparison to SQN's, thus negating the need for a reduction in height for the BFN HI-STORM 100,

(2) We found no evidence that the proposed BFN HI-STORM 100 model would have had a significant reduction in radiation dose, and

(3) Holtec initially proposed a price for the SQN HI-TRAC 125D that was the same price subsequently proposed for BFN. The final SQN price resulted from a discount offered by Holtec late in the bidding process. Holtec's claim that the lower SQN price was the result of an arithmetic error rather than a discount may have created the illusion that its prices were not negotiable. (Note – Holtec's final letter transmitting a comparison of the prices did not include the statements from the draft about the HI-STORM 100. However, the letter continued to mislead the TVA negotiation team regarding SQN's low price for the HI-TRAC 125D, referring to it as "an estimating department error.")

It appeared TVA relied on the information provided by Holtec to justify paying the higher BFN prices rather than attempting to negotiate lower pricing for BFN. Although it is unknown if TVA could have successfully negotiated lower prices for BFN, key economic indicators and reductions in material prices between the time period when Holtec proposed the SQN and BFN prices indicate TVA had an opportunity to negotiate better prices. For example, the price of steel had fallen about 7 percent during the period between the SQN proposal and the BFN proposal.

In summary, we found no evidence that the higher prices TVA agreed to pay for the BFN MPC, HI-STORM 100, and HI-TRAC 125D were reasonable. Instead, it appeared (1) Holtec may have misled TVA regarding its pricing, and/or (2) TVA did not attempt to negotiate better prices at BFN.

<u>Vertical Crawler</u>

Contract No. 99999906 provided that the pricing for (b)(4)
(b)(4)                                   Although the price TVA paid for the SQN crawler was in accordance with the cost-plus provision, the price for the BFN crawler was not. As discussed below, TVA's price for the BFN vertical crawler should have been at (b)(4)                 less than the amount quoted by Holtec. Additionally, since Holtec's price quote for BFN was (b)(4)                                                              in our opinion the quoted price was a misrepresentation by Holtec that it was complying with the contract's pricing provision.

<u>Holtec's Cost for Vertical Crawler Supplied to BFN</u> – The vertical crawlers provided for SQN and BFN were manufactured and sold to Holtec by Lift Systems. Although the SQN crawler

TVA RESTRICTED INFORMATION

Attachment 8
Page 4 of 4

Charles A. Kandt
Page 4
July 30, 2007

had been ordered by Holtec specifically for the SQN project, the crawler that was sent to BFN had originally been ordered by Holtec for a project it had with Hope Creek Nuclear Plant (Hope Creek). When TVA requested Holtec to provide a crawler for BFN, to meet TVA's time requirements Holtec apparently requested Lift Systems to (1) send the crawler that had been manufactured for Hope Creek to BFN and (2) manufacture another crawler for Hope Creek.

We reviewed documentation of the prices Holtec paid Lift Systems for each of the crawlers and found Holtec had paid Lift Systems (b) (4)
(b) (4)   Based on the prices Holtec paid for the two vertical crawlers, the most that should have been billable to TVA would have been (b) (4)

Potential Misrepresentation by Holtec – (b) (4)
(b) (4)          the quoted price misrepresented Holtec's compliance with the contract's cost-plus provision. Additionally, Holtec may have made false statements by informing TVA the price for the BFN crawler was higher than the price of the SQN crawler because the BFN crawler (1) had enhancements that the SQN crawler did not have and (2) included expediting fees. We found the enhancements on the BFN crawler were minor and would not have materially affected Holtec's cost. Additionally, we found no evidence that Holtec incurred any expediting fees other than the higher price it paid Lift Systems for the replacement crawler for Hope Creek.

-   -   -   -   -   -   -

Based on discussions we have had with (b) (7)(C)          we understand OIG Investigations does not want Audit Operations to issue an audit report to TVA or Holtec at this time since the investigation is ongoing. Accordingly, we are providing the information in this memorandum for use in your ongoing investigation. If you need additional information, please contact (b) (7)(C)
(b) (7)(C)

*Ben R. Wagner*

Ben R. Wagner
Deputy Inspector General
ET 3C-K

JHB:JP
cc:  Jack E. Brennan, ET 4C-K
     (b) (7)(C)

     Richard W. Moore, ET 4C-K
     OIG File No. 2007-11160
_____
[2]  TVA could make an argument (b) (4).          However, a legal
opinion would be needed as to whether TVA could prevail at paying this lower cost since Holtec apparently
had to pay a higher cost to replace the Hope Creek crawler.

**TVA RESTRICTED INFORMATION**