CHARLES G. LA BELLA (SBN 183448)
charles.labella@btlaw.com
ERIC BESTE (SBN 226089)
eric.beste@btlaw.com
ZACHARY P. HELLER (CA Admission pending)
zachary.heller@btlaw.com
**BARNES & THORNBURG LLP**
655 West Broadway, Suite 900
San Diego, California 92101
Telephone:  619.321.5000
Facsimile:   619.284.3894

RANDY GORDON
randy.gordon@btlaw.com
**BARNES & THORNBURG LLP**
2121 N. Pearl Street, Suite 700
Dallas, TX 75201
Telephone:  214.258.4148
Facsimile:   214.258.4199

Attorneys for Plaintiff,
Public Watchdogs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PUBLIC WATCHDOGS, a California 501(c)(3) corporation,<br><br>Plaintiff,<br><br>v.<br><br>SOUTHERN CALIFORNIA EDISON COMPANY; SAN DIEGO GAS & ELECTRIC COMPANY; SEMPRA ENERGY; HOLTEC INTERNATIONAL; UNITED STATES NUCLEAR REGULATORY COMMISSION; and DOES 1 through 100,<br><br>Defendants. | Case No. **'19CV1635 JM   MSB**<br><br>**MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Complaint Filed:<br>Judge: |

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

**Preliminary Statement**

Plaintiff Public Watchdogs has filed a Complaint alleging federal and state claims against Defendants, who are in the process of burying toxic nuclear waste in defective containment vessels on a site that is in a tsunami inundation zone, between two seismic fault lines, a mere 108 feet from the Pacific Ocean.  Because there is an imminent danger that the canisters will fail and release deadly radioactivity into a highly populated region of Southern California, immediate equitable relief is warranted.

## I.   NATURE OF THE MOTION

By way of this Motion, Plaintiff Public Watchdogs[1] seeks a preliminary injunction and temporary restraining order enjoining Defendants Southern California Edison Company ("Edison"), San Diego Gas & Electric Company ("SDG&E"), Sempra Energy ("Sempra")[2], Holtec International ("Holtec"), and the United States Nuclear Regulatory Commission ("NRC") from transferring toxic nuclear waste into defective Holtec storage canisters at the defunct San Onofre Nuclear Generating Station ("SONGS") and burying those canisters.   Due to the Defendants' mismanagement and mishandling of the nuclear waste, the design and manufacturing defects of the Holtec canisters, and the dangerous burial site, there is an imminent danger that the canisters will fail, releasing deadly nuclear waste into the surrounding

---

[1]  Public Watchdogs is a 501(c)(3) non-profit corporation that operates as a public safety advocate to ensure that government agencies and special interests comply with all applicable laws, including public-safety and environmental-protection laws, especially in the public utilities industry.  Plaintiff has at least one member who lives within the zone of exposure for a potentially catastrophic release of radioactive material from Defendant's actions.  *See* Declaration of Nina Babiarz ("Babiarz Decl."), ¶¶ 2-3.

[2]  Edison and SDG&E are public utilities that own 78.2 % and 20% of SONGS, respectively.   Sempra is the parent company of SDG&E.   Complaint ¶¶ 5-7; Declaration of Charles G. La Bella ("La Bella Decl."), ¶ 2, Ex. 1.  Edison, SDG&E and Sempra shall be collectively referred to hereinafter as the "SONGS Defendants."

area and causing catastrophic harm to the environment and residents of San Diego County, including members of Public Watchdogs.  Despite these clear warning signs, Defendants have already buried 31 defective canisters and are in the process of filling and burying 42 more. Defendants are planning to bury the next canister **this week—** on August 29, 2019—and a second canister by September 6, 2019. Immediate injunctive relief is necessary to stop Defendants from filling and burying additional canisters.  This is so because once a defective canister is buried, there is no existing method to (1) unearth the canister, (2) transfer the nuclear waste to either a safer canister or a safer location, or (3) inspect the canister to determine whether or not its critical systems are functioning properly.   In other words, the peril looms and consequences are irreparable, and only a Temporary Restraining Order can prevent this harm from occurring.

## II.   FACTUAL BACKGROUND

### A. The SONGS Defendants are burying deadly nuclear waste in a tsunami inundation zone, near a fault line, 108 feet from the ocean, in a heavily populated area.

Due in large part to the safety and regulatory failures described in detail in the Complaint, SONGS ceased operations on June 12, 2013, and began the process of "decommissioning" its then-existing electric generating facilities.[3]   There was no objective, independent risk assessment performed before the SONGS Defendants' decommissioning plan was adopted, approved by the NRC, and implemented in this high-risk location.  Under this decommissioning plan, the SONGS Defendants are to dispose of "Spent Nuclear Fuel" (SNF)—high-level nuclear waste lethal to humans and toxic to the environment—by burying it onsite in a containment system that will store SNF nearly 20 feet underground.[4]  This containment system, also referred to as

---

[3] Complaint ¶¶ 18-32.
[4] *Id.*

the Independent Spent Fuel Storage Installation (hereinafter "ISFSI"), is ill-conceived and dangerously located.[5]

**B. Current Wet Storage.**

From the inception of operations at SONGS, and continuing during the period of active electricity generation, SNF has been stored in "wet storage" holding pools in Units 2 and 3. When operations ceased at the plant, the SONGS Defendants continued to use wet storage to maintain the SNF. These wet storage pools and their external structures were specifically designed and built to ensure the relatively safe storage of this toxic and radioactive material. Today, the wet storage units in Units 2 and 3 are as safe to the public or the environment as when the plant was fully operational, and the risks remain the same.

**C. Ill-Conceived Idea of Transferring SNF Out of Wet Storage.**

Once operations ceased at the plant, the SONGS Defendants led a group of corporate interests in formulating a "Decommissioning Plan" that envisioned, among other things, moving the SNF from the relatively safe wet storage in Units 2 and 3 into "dry storage" canisters that would hold the SNF during an extended cooling process. Under the initial plan proposed by the SONGS Defendants, the SNF was to be moved from the relatively safe wet storage pools, loaded into 72 self-cooling "dry storage" canisters, and transported to an undetermined permanent storage facility. Although this initial idea morphed into the current Decommissioning Plan – with extended storage now occurring at the inherently dangerous SONGS location – the transfer of SNF from wet storage to dry storage canisters remains a cornerstone of the SONGS Defendants' scheme.  And it is the root cause of the current dangers to life, health, and property that triggered this request for injunctive relief.

In the initial decommissioning plan, the SONGS Defendants acknowledged that it wanted to move SNF from SONGS to a yet undetermined site. The desire was

---

[5]  Complaint ¶ 52; La Bella Decl. ¶¶ 4-6, Exs. 3-5.

explicitly stated on numerous occasions by SONGS Defendants.  For example, in a September 2014 "Post –Shutdown Report" transmitted to the NRC, Palmisano, (Edison's Vice President and Chief Nuclear Officer) stated:

> As discussed in the Spent Fuel Management Period details and the currently submitted IFMP (Irradiated Fuel Management Plan), it will be necessary to further expand the current ISFSI (Independent Spent Fuel Storage Installation) capacity to store the complete inventory of Units 2 and 3 spent fuel. The location, capacity, and technology to be employed have yet to be finalized.

In other words, the Decommissioning Plan was conceived and put into play by the SONGS Defendants before it knew whether the "location, capacity and technology" existed to safely store SNF outside of the current wet storage. Nor did the original decommissioning plan contemplate the long-term burial of SNF on the SONGS site. Rather, it was only by virtue of the NRC's failure to approve a permanent storage facility that the SONGS Defendants' plan morphed into one involving the removal of SNF from wet storage in Units 2 and 3, transportation into dry canisters, and burial of the SNF near the beach in San Onofre.  By altering the Decommissioning Plan to permit moving SNF from Units 2 and 3, placing this dangerous substance into thin, inferior, and untested canisters, and dropping them into holes dug into the beach at the San Onofre, the SONGS Defendants, with the NRC's concurrence, substantially increased the danger of a nuclear disaster involving SNF.

### D. The Transfer Debacle.

The process of transferring SNF out of wet storage – overseen from the outset by Thomas J. Palmisano, Defendant Edison's Vice President and Chief Nuclear Officer – has been riddled with negligence, flawed management, inadequate oversight and performance, errors, miscues, and "near misses" of a nuclear disaster. The NRC's own analysis, in scientific and technical jargon, is the best evidence of the total breakdown that has occurred at SONGS during the removal of SNF from the relative safety of wet storage in Units 2 and 3 and transfer into dangerous dry

BARNES & THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

1  storage.

2  On July 22, 2018, on Palmisano's watch, the SONGS Defendants nearly

3  dropped a 49-ton canister full of deadly radioactive nuclear waste more than 18 feet

4  into the ISFSI when it was caught on a quarter inch thick steel guide ring.  The

5  SONGS Defendants referred to this event as an "unsecured load event."  In actuality,

6  this event could have turned San Onofre State Beach Park and much of Southern

7  California into a permanently uninhabitable nuclear wasteland.

8  Pursuant to 10 C.F.R. § 72.75, any incident involving nuclear waste must be

9  reported to the NRC within twenty-four hours. And yet despite this clear and

10 unambiguous directive, Palmisano and the SONGS Defendants never filed a written

11 report of this incident to the NRC.  As a result, the public was kept in the dark about

12 the potentially disastrous incident on July 22, 2018.  And, if the NRC and SONGS

13 Defendants had their way, the public would still be in the dark about this incident.

14 It wasn't until ten days later when there was yet another potentially

15 catastrophic event at SONGS that the NRC was notified orally by the SONGS

16 Defendants of another incident. The facts surrounding this second event – as

17 recounted by the NRC – are equally troubling:

18 On Friday, August 3, 2018, at approximately 1:30 pm (PST), SONGS
   was engaged operations involving movement of a loaded spent fuel
19 storage canister into its underground ISFSI storage vault (HI-STORM
   UMAX storage system).  As the loaded spent fuel canister was being
20 lowered into the storage vault using lifting and rigging equipment, the
   licensee's personnel failed to notice that the canister was misaligned and
21 was not being properly lowered.  The licensee continued to lower the
   rigging and lifting equipment until it believed that the canister had been
22 fully lowered to the bottom of the storage vault. However, a radiation
   protection technician identified elevated radiation readings that were not
23 consistent with a fully lowered canister.  The licensee then identified
   that the loaded spent fuel canister was hung up on a metal flange near
24 the top of the storage vault, preventing it from being lowered, and that
   the rigging and lifting equipment was slack and no longer bearing the
25 load of the canister.

26 In this circumstance, with the important to safety (ITS) rigging and
   lifting equipment completely down in the lowest position, the ITS
27 equipment was disabled from performing its designed safety function of
   holding and controlling the loaded canister from a potential canister
28 drop condition. . . . The estimated time the canister was in an unanalyzed

credible drop condition was approximately 45 minutes to 1 hour in duration.

Exhibit 36 to Complaint, at 2.

**E. The Admission of Negligence.**

In its initial reaction to the August incident, the NRC appeared to understand the chaos resulting from mismanagement by Palmisano and others at the SONGS Defendants. In its Special Inspection Report and Notice of Violation dated November 28, 2018, the NRC notified the SONGS Defendants:

> The NRC is concerned about apparent weaknesses in management oversight of the dry cask storage operations. Your staff did not perform adequate direct observational oversight of downloading activities performed by your contractor, insuring adequate training of individuals responsible for performing downloading operations, provide adequate procedures for downloading operations, or ensure that conditions adverse to quality were entered into the corrective action program. The NRC identified that a causal factor for the misalignment incident involved management weakness in the oversight of dry cask storage operations.

(Ex. 37 to Complaint at page 2). These observations would be troubling enough if they were discovered at a child day care center, or at a fertilizer manufacturing facility. In the context of the highly dangerous activity of transporting deadly nuclear fuel, they are terrifying.

The NRC further found that in addition to experiencing "difficulty in aligning canister 28 for downloading into the independent spent fuel installation vault," and repeatedly causing "contact between the canister and vault components" for months, the SONGS Defendants did not even include mention of these failures in any corrective action program, or perform an assessment to prevent such dangerous events from happening in the future.[6] Thus, months after the dangerous events of July and August 2018, the SONGS Defendants still did not have post-incident measures in place to avoid future incidents.

Notwithstanding the gross negligence demonstrated by Palmisano and his

---

[6] Exhibit 37 to Complaint, at 5 ("Enclosure 1").

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

team, NRC left it to the SONGS Defendants to address training and other related failures, and did not require an objective and independent analysis of how to avoid future incidents.  Yet even Edison recognized the malfeasance of its personnel, as it soon thereafter replaced Palmisano as SONGS' Chief Nuclear Officer and reassigned him to a "Community Engagement Panel" position.  Thus, Defendant Edison itself has acknowledged the gross negligence of Palmisano and his management team at SONGS – the same team that has been in place from the inception of the Decommissioning Plan to its recent execution.  But this stunning admission by Defendant Edison of a systemic and deep-rooted concern about safety and supervisory management concerns at SONGS does nothing to address either the root cause of the problem – that is, the transportation of SNF from relatively safe wet storage to relatively unsafe dry canisters – or obviate the need for a dispassionate and independent analysis of the risks.

**F. Calamitous Canisters.**

In addition to the dangerous manner in which the SONGS Defendants are executing the Decommissioning Plan, the safety of the canisters into which they are loading SNF are highly questionable.  Even if the already buried canisters had not been compromised by scratches and other damage, these receptacles were never intended for long term storage or transportation to a permanent storage facility. The canisters cannot be opened safely, and the fuel cannot be transferred to another canister or back into wet storage should its tomb fail. Indeed, the canisters themselves are guaranteed by Defendant Holtec for a mere 25 years, and they are buried into silos or sleeves that are guaranteed for only 10 years. These factors alone are sufficient to justify a temporary cessation of transportation to dry storage.

In January 2018, the SONGS Defendants began transferring the SNF from refrigerated "wet storage" holding pools into 73 passively cooled "dry storage"

canisters designed and manufactured by Holtec.[7]  A single Holtec canister contains hazardous radioisotopes (collectively, the canisters hold thousands of spent fuel rods), including more radioactive Cesium-137 than what was released globally during the Chernobyl Disaster.[8]   Among the problems with the design and manufacture of these canisters are:

First, the Holtec canisters are not guaranteed to function long enough for any of the stored nuclear waste to be transferred safely.  Indeed, Holtec warrants the canisters for only 25 years despite the radioisotopes in each canister remaining radioactive and deadly for centuries.[9]  Similarly, the system used to store the canisters in steel-lined, underground concrete holes in the ISFSI is guaranteed for only 10 years.[10]

Second, the Holtec canisters are problematically designed and manufactured for the purpose of storing nuclear waste.[11]  Specifically, the Holtec canisters are so-called "thin-wall" canisters, with only a 5/8 inch thick stainless steel wall that is susceptible to "gouging" and attendant failure.[12]  By contrast, the vast majority of international nuclear decommissioning projects employ thick-walled dry casks with

---

[7]  Complaint ¶ 66; La Bella Decl. ¶ 3, Ex. 2.
[8]  Complaint ¶ 50.
[9]  Complaint ¶ 67; La Bella Decl. ¶ 9, Ex. 8.
[10]  *Id.*
[11] The  standards used to evaluate the design and manufacture of nuclear waste storage canisters include several set by the American Society Mechanical Engineers (ASME), such as the standards for Boiler and Pressure Vessels (the standard allegedly applicable to the Holtec canisters). *See* March 2019 Community Engagement Panel Transcript at 165:23-167:1, a copy of which is attached to the Complaint as **Exhibit 9**.
[12] Complaint ¶¶ 68-71.

anywhere between 9 and 18-inch thick walls.[13]  These casks are made of lead, steal, concrete and/or copper to create a strong radiation barrier.[14]

Third, and perhaps most troubling, many of the canisters have broken components called stand-off shims.  These shims were designed to enhance convection cooling of the hot fuel assemblies by creating additional space for helium gas to flow throughout the canister so that the stored spent nuclear fuel does not over-heat and unleash a deadly nuclear reaction.  But these same shims render the canisters particular susceptible to leakage, especially if jostled during a tsunami or earthquake.

**G. SONGS Defendants narrowly avoided a radioactive disaster by nearly dropping two 49-ton canisters full of deadly radioactive nuclear waste, then attempting to cover it up.**

As if the canister defects were not enough, the process for handling the canisters is itself flawed.  As outlined above, on July 22, 2018, the SONGS Defendants nearly dropped a 49-ton canister full of deadly radioactive nuclear waste more than 18 feet into the ISFSI when it was caught on a quarter inch thick steel guide ring.[15]  Ten days later, on August 3, 2018, the SONGS Defendants once again lost control of a 49-ton canister full of radioactive nuclear waste while it was being lowered into a below-ground storage silo.  In both instances, the relevant Defendants failed to provide timely notice to the NRC of these nears misses.[16]  And in response to these potentially catastrophic events, the NRC merely imposed a financially insignificant fine on one of the SONGS Defendants.  Predictably, the SONGS Defendants offered nothing more than vague assurances of greater care going

---

[13] A leading alternative, the CASTOR thick-wall canister, is the containment and transportation product of choice for the majority of decommission projects across the world.  *See Castor*, Eur. Nuclear Soc'y, https://www.euronuclear.org/info/encyclopedia/castor.htm (last visited July 24, 2019).

[14] Complaint ¶ 70.

[15] Complaint ¶¶ 84-86; La Bella Decl. ¶ 13, Ex. 12 [Nov. 28, 2018 Letter, at 7-8].

[16] Complaint ¶ 91; Babiarz Decl. ¶ 4; La Bella Decl. ¶ 11, Ex. 10 [August 9, 2018 Community Engagement Panel Transcript at 104:12 – 107:18].

forward.   These are but two specific examples of the NRC's abdication of its regulatory and supervisory obligation to ensure public safety at SONGS, thereby requiring Plaintiff to bring this action and seek immediate injunctive relief.

### H. Suspect Site Selection.

Aside from the flawed transfer process and the loading of deadly SNF into questionable dry storage canisters, the suspect site chosen by the SONGS Defendants for this entombing is itself enough to warrant injunctive relief. Defendants seek to continue the burial of dangerous SNF in questionable canisters in a tsunami zone that sits atop several fault lines, yards away from the Pacific Ocean.  Given the numerous dangerous incidents and repeated management failures at this particular site, Plaintiff is entitled to a temporary reprieve of the hazardous activities to allow for a more objective analysis of the risks be conducted.

### III.   ARGUMENT

### A. Plaintiff easily clears the temporary equitable relief bar.

The standards for obtaining a preliminary injunction or temporary restraining order are well established: a plaintiff must establish that (1) it will likely suffer irreparable harm in the absence of preliminary relief; (2) it is likely to succeed on the merits of its claims; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). The Ninth Circuit approaches these factors with a sliding scale:  so long as the plaintiff establishes a likelihood of irreparable injury and an injunction is in the public interest, it need only show "serious questions going to the merits" and "a balance of hardships that tips sharply towards the plaintiff." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

As federal courts throughout the nation have recognized, the disposal of hazardous materials is a paradigmatic fact-pattern demonstrating the necessity and propriety of temporary injunctive relief. *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248 (3d Cir. 2005) (injunctive relief granted to non-profit community

organization against chemical manufacturer to require clean-up of contaminated chromium); *FiberMark N. Am., Inc. v. Jackson*, No. CIV. A. 07-839 (MLC), 2007 WL 4157235, at *1 (D.N.J. Mar. 28, 2007) (TRO granted to enjoin defendant from causing or allowing discharge of solid waste into river); *Hirt v. Richardson*, 127 F. Supp. 2d 833 (W.D. Mich. 1999) (court granted TRO to enjoin Department of Energy's shipment of plutonium, but ultimately denied preliminary injunction as an impermissible intrusion on executive branch's authority over foreign policy).

### B. Irreparable harm is self-evident.

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *All. for the Wild Rockies*, 632 F.3d at 1135. Here, once a defective Holtec canister is buried, there is no way to (1) unearth the canister, (2) transfer the nuclear waste to either a safer canister or a safer location, or (3) inspect the canister to determine whether or not its critical systems are functioning properly. Indeed, the Chief Nuclear Officer at SONGS, Tom Palmisano, admitted that *there is no existing method for safely opening the defectively designed canisters*.[17] He also stated that it would be at least three years before the techniques necessary to unload and inspect a canister *could possibly* be developed.[18] And yet—in the face of this stunning admission and **before** the technique is developed—the NRC has permitted the burying to resume. Greg Jacsko, the former head of the NRC in 2012 when SONGS shut down, has also stated that the SONGS Defendants should stop burying nuclear waste at SONGS because "once they get loaded, I don't see them ever taking those canisters out of

---

[17] La Bella Decl. ¶ 10, Ex. 9 [March 22, 2018 Community Engagement Panel Meeting Transcript at 85:16–86:18].
[18] *Id.*

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO

there."[19]   In short, Defendants are creating what one scientific commentator has called a "trash heap deadly for 250,000 years."[20]

**C. An injunction is in the public interest.**

There is a strong "public interest in preserving nature and avoiding irreparable environmental injury." *All. for the Wild Rockies*, 632 F.3d at 1138.  Given the nature of the environmental—indeed, human—costs associated with the burial of radioactive waste in defective containers on dangerous grounds, public interest can be served only by equitable relief.

**D. The balance of hardships tips sharply in Plaintiff's favor.**

Courts considering whether or not to grant a motion for preliminary injunction or temporary restraining order "must balance the competing claims of injury and consider the effect of granting or withholding the requested relief, paying particular regard to the public consequences." *Winter*, 555 U.S. at 129.  Here, just as there would be no harm to the public in halting the transfer and burial of the defective Holtec canisters, so would it be with respect to Defendants.  Maintaining the *status quo* will cause Defendants little or no harm as this matter is reviewed by the Court on a full record.[21]  In the meantime, the spent fuel can remain in the pools that were designed and tested for this very purpose.

_____

[19] https://www.kpbs.org/news/2018/aug/02/former-nrc-chief-says-edison-should-stop-burying-n/ (embedded video of Jacsko statements).
[20] David Biello, *Spent Nuclear Fuel: A Trash Heap Deadly for 250,000 Years or a Renewable Energy Source?*, Sci. Am. (Jan. 28, 2009), https://www.scientificamerican.com/article/nuclear-waste-lethal-trash-or-renewable-energy-source.
[21] Any assertion that Defendants *would* be harmed is quickly disproven by the fact that they themselves halted the transfer and burial of Holtec canisters for thirteen months.  Given the expedited nature of this litigation, Defendants can hardly complain about an extension of this moratorium while the Court assesses the allegations in the Complaint.

**E. Plaintiff Will Likely Succeed on the Merits.**

Plaintiff's Complaint raises "serious questions" regarding the propriety of Defendants' actions, and is likely to prevail on each of its claims for (1) violation of the Administrative Procedure Act (5 U.S.C. § 701 *et seq.*), (2) public nuisance, and (3) strict products liability.

### 1. Violation of Administrative Procedure Act

Plaintiff alleges that the NRC violated multiple provisions of the Administrative Procedure Act ("APA") by granting the SONGS Defendants' application to amend its license and decommission the SONGS Facility.[22]

The APA governs the manner in which federal administrative agencies may propose and establish regulations, and grants federal courts oversight over all agency actions. "In enacting the APA, Congress made a judgment that notions of fairness and informed administrative decision-making require that agency decisions be made only after affording interested persons notice and an opportunity to comment." *Chrysler Corp. v. Brown*, 441 U.S. 281, 316 (1979); *see also Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1485 (9th Cir. 1992) ("[T]he notice and comment requirements ... are designed to ensure public participation in rulemaking.").

The NRC violated the Sections 553, 554, 556, 557 and 706 of the APA by, *inter alia*, (1) failing to give the public and all interested parties an opportunity to participate in the decision to approve the License Amendment, (2) approving the License Amendment and the associate plan for storage of SNF in an "arbitrary" and "capricious" manner "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right", and (3) failing to perform proper oversight of the decommissioning process.[23]

---

[22] An agency action must be "reviewable by statute" or be a "final agency action for which there is no other adequate remedy[.]" 5 U.S.C. § 704. The NRC's License Amendment, as promulgated, is a final enactment, subject to immediate challenge and action by reason of current, subsisting, and binding effect.

[23] Complaint ¶¶ 107-18.

### 2. Public Nuisance

Plaintiff alleges that Edison, SDG&E, Sempra, and Holtec's (collectively, the "Nuisance Defendants") implementation of the current decommissioning plan and the associated threat of nuclear disaster constitute a public nuisance.

Under California law, a "nuisance" is "[a]nything which is injurious to health … or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property[.]" Cal. Civ. Code § 3479.  The "mere apprehension of injury from a dangerous condition may constitute a nuisance where it interferes with the comfortable enjoyment of property[.]" *McIvor v. Mercer-Fraser Co.*, 76 Cal. App. 2d 247, 254 (1946); *see also People v. Oliver,* 86 Cal. App. 2d 885, 889 (1948) ("A fire hazard, at least when coupled with other conditions, can be found to be a public nuisance and abated."). And a public nuisance is a nuisance "which affects at the same time an entire community or neighborhood, or any considerable number of persons[.]" Cal. Civ. Code § 3480.  Pollution and damage to the environment caused by defendants' actions are classic examples of public nuisance.  *See, e.g.*, *Cal. Dep't of Toxic Substances Control v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998) (groundwater contamination constitutes a public nuisance).

Here, the Nuisance Defendants' acts pose an imminent, significant, and unreasonable threat to the public health and safety of millions of people that live and work anywhere near SONGS.  In addition to the catastrophic impact on the environment and neighboring communities, this potential disaster would also cause significant, unreasonable, and irreparable harm to Public Watchdogs in its role as a public safety advocate working to ensure that government agencies and special interests comply with public-safety and environmental-protection laws.

### 3. Strict Products Liability

Plaintiff alleges that Holtec is strictly liable for negligently designing, manufacturing, and/or assembling the defective canisters used to store the SNF.

"The elements of a strict products liability cause of action are a defect in the manufacture or design of the product or a failure to warn, causation, and injury." *Cty. of Santa Clara v. Atl. Richfield Co.*, 137 Cal. App. 4th 292, 318 (2006) (*citing Soule v. Gen. Motors Corp.*, 8 Cal. 4th 548, 560 (1994)). Under California law, the doctrine of strict liability is not "limited either 'on a theory of privity of contract' or 'on the theory that no representation of safety is made to the bystander.'" *Price v. Shell Oil Co.*, 2 Cal. 3d 245, 251 (1970). In other words, bystanders may recover in strict liability.

In our case, Holtec owed a duty to Plaintiff and California residents to design and manufacture the Holtec canisters in such a way that made the canisters safe for their intended purpose of permanently storing spent nuclear fuel at the SONGS ISFSI. Holtec breached this duty by delivering canisters that (1) are not guaranteed to function long enough for any of the stored radioisotopes to be transferred safely, (2) fail to meet the acceptable industry standards for the design and manufacture of nuclear waste storage containers, and (3) have broken components.

**F. Plaintiff need not provide an undertaking.**

Rule 65(c) of the Federal Rules of Civil Procedure invests the Court "with discretion as to the amount of security required, if any" to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. *Barahona–Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999) (citing *Doctor's Assoc., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996)). "The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). Since there is no likelihood of harm to the SONGS Defendants in halting the transfers of SNF to the defective Holtec canisters and burying them pursuant to the decommissioning plan, Plaintiff requests that it not be required to post a bond.

**Conclusion**

Defendants are taking a dangerous course without adequately considering the grave risks, or alternative courses of action.  Because their movement and storage of dangerous nuclear waste could irreparably harm Southern California for centuries, their current course of recklessness must be stopped in its tracks.   Temporary equitable relief is a fair and necessary to avoid a quickly materializing disaster.

Respectfully submitted,

Dated:  August 26, 2019               **BARNES & THORNBURG LLP**


By: /s/ Charles G. La Bella
    Charles G. La Bella
    Attorneys for Plaintiff
    Public Watchdogs

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
SAN DIEGO